INTERNATIONAL TRUST CO. v. DECKER BROS. et al.

(Circuit Court of Appeals, Ninth Circuit.  February 11, 1907.)

No. 1,335.

1. RECEIVERS—AUTHORITY TO APPOINT—GROUNDS OF APPOINTMENT.

To warrant the appointment of a receiver by a court of equity, it is as a general rule essential that the plaintiff should show that the property constitutes a special fund to which he has a right to resort for the satisfaction of his claim, and that the property itself or the income arising therefrom is in danger of loss from neglect, waste, misconduct, or insolvency of the defendant.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 42, Receivers, §§ 21–31.]

2. SAME—RECEIVERS' CERTIFICATES—POWER OF COURT TO AUTHORIZE.

The practice of issuing receivers' certificates to continue the business and giving them priority of lien is peculiar to cases of insolvent railroad companies or other public service corporations, and finds its reason in the necessity of keeping the business a going concern both for the convenience of the public and the preservation of the security, but neither the practice nor the reasons supporting it apply to corporations engaged in a strictly private business, and, in case of such corporations, the court has not the power to authorize a receiver to incur indebtedness for carrying on the business and to make the same a paramount lien upon the corpus of the property, to the displacement of prior contract liens, without the consent of the holders of such liens.  In such cases the power to authorize the issuance of receivers' certificates extends only to the necessary expenditures incident to the administration and preservation of the property until the business can be wound up and the receivership ended.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 42, Receivers, §§ 204–223.]

3. SAME—SUITS AGAINST INSOLVENT CORPORATION—ORDER FOR SALE OF PROPERTY.

At suit of a simple contract creditor for a comparatively small sum a receiver was appointed for the property of certain mining companies, and was continued in possession for eight years, during which he issued, under authority given by the court, receivers' certificates for some $400,000, which were by the orders made first liens on the property, and the proceeds of which were for the most part expended in operating and developing the property.  The property was subject to a prior mortgage for a large sum securing bonds, but the mortgagee was not a party to the suit at the time such certificates were issued.  Being subsequently brought in, it filed a cross-bill for foreclosure, and also asked that new parties be brought in and certain adverse claims affecting the property be adjudicated and the priority of liens determined, to the end that the property might be sold for the highest possible price.  Held, that it was an abuse of discretion for the court to order a sale of the property without first determining such matters; it clearly appearing that they would largely affect the sale of the property and prevent its bringing its full value.

Appeal from the District Court of the United States for Division No. 1 of the District of Alaska.

On July 1, 1896, the Berners Bay Mining & Milling Company, a corporation existing under the laws of the state of Maine, but doing business in Alaska, mortgaged its properties, consisting of mines, mining claims, mill sites, and water rights, and the appurtenances thereto, comprising mills, buildings, railroads, tramways, machinery, and equipment, all situated in Alaska, to the International Trust Company, of the commonwealth of Massachusetts, to secure the payment of certain bonds aggregating the sum of $500.000, all issued and disposed of for the benefit of the mining company. Subsequently, on December 15, 1897, Decker Bros. instituted an action against the Berners Bay Mining & Milling Company, the Seward Gold Mining Company, the Northern Belle Gold Mining Company, and the Ophir Gold Mining Company as parties defendant, the three last-named corporations having succeeded on November 1, 1897, to all the property, rights, and interests, and assumed all the obligations, indebtedness, and liabilities, of the first. From the complaint it appears that the defendants were indebted to the plaintiffs in the sum of $154.65 for goods and wares sold and delivered; that latterly the companies had employed many men, at an expense of from $12,000 to $15,000 per month; that the output of the mines was insufficient with which to meet the running expenses for the six months preceding the commencement of the action; that an indebtedness of about $500.000 was outstanding; that many of the creditors were threatening suit, and the property of the defendant companies was in danger of being wasted and exhausted; that said companies were in imminent danger of becoming insolvent; that, if a receiver were appointed to manage their business under the direction of the court, they would be able to discharge all of their indebtedness, but that otherwise they would not; that plaintiffs had previously cashed a large number of checks issued by defendants, amounting to from $3,000 to $3,500, which were yet outstanding and unpaid; and that, according to the belief of plaintiffs, if the property of defendants were put up at forced sale, there would not be realized a sum sufficient to meet their liabilities, wherefore, plaintiffs prayed the appointment of a suitable person to take charge of the property and effects, and to manage the business of the defendant corporations, and for the payment of their demands during the course of such receivership. Nothing further appears from the record to have been done until July 13, 1905, when the defendants in the action joined in a petition to the court, praying that the International Trust Company be made a party to the proceeding; that such company, and all persons interested, be required to appear and show cause why the properties of the defendant companies should not be sold; and that upon such hearing a master be appointed to dispose of the same. The petition shows, among other things, that the "receivership was made necessary by reason of the fact that the said properties were undeveloped, and the expenses of development necessary to put them upon a paying basis exceeded the means available for that purpose"; that the receiver had since his appointment borrowed a large amount of money on receiver's certificates, aggregating between $385,000 and $390,000, under the orders of the court, made with the consent of the holders of the bonded indebtedness of the defendants, and by means thereof had developed the properties and increased their intrinsic value to an amount largely in excess of the amount of such indebtedness; that, in addition to the said liabilities of the receiver, the defendants were indebted in the sum of $500,000, with interest aggregating about $700,-000, evidenced by bonds secured by trust deed to the International Trust Company; that, in order to make the property productive, it was necessary to erect a larger reduction plant and to continue the development work already done, and that about $150,000 would be required for that purpose; that the defendants were wholly insolvent and unable to pay such indebtedness, or to operate the property; that for several years previous the parties interested in the property, including the bondholders and holders of the receiver's certificates, had been endeavoring to reorganize, but all without avail; and that the indebtedness of the defendant companies was rapidly increasing.

Subsequently, on December 9, 1905, defendants in said action filed an answer and cross-complaint, which alleged that the claim of the plaintiffs had been paid by the receiver; that in the month of December, 1897, the defendants were largely indebted for wages and salaries of employés, and for sup-

plies and other expenses for operating the mining properties of the defendants, aggregating $100,000 or more; and that they were, and ever since had been, insolvent and unable to pay their debts in due course of business. It then recited the fact of the appointment of the receiver, the execution and delivery of the mortgage deed of trust to the International Trust Company (setting out a copy), the disposal of the bonds upon the market, and that none of the defendants had been able to pay anything upon the principal or interest thereof; that subsequent to his appointment the receiver had been acting at the instance of the bondholders, had obtained orders from the court in pursuance whereof he had borrowed large sums of money upon receiver's certificates, and otherwise incurred indebtedness in the administration and betterment of the properties, which indebtedness was in equity a primary lien against said properties, superior and prior to said bonded indebtedness, and that by reason of the accumulation of such liabilities there was a necessity for the sale of all of the properties of the defendant corporations, and a distribution of the proceeds arising therefrom, so that the business might be wound up and the affairs settled. The defendants demanded that the International Trust Company be made a party defendant, that the court should decree a sale of the properties, and that the proceeds thereof should be applied to the indebtedness according to priority and rank.

On February 28, 1906, F. D. Nowell, the receiver, moved the court for an order directing the sale of all the properties of the defendants in his hands, that the same might be converted into money, and paid out under the orders of the court to parties entitled thereto. He averred that the receivership had continued for a long period of more than eight years; that in the meanwhile the parties concerned had made repeated efforts to reorganize; that for the payment of the current and necessary expenses of the receivership he had borrowed large sums of money, aggregating $400,000, on receiver's certificates, all of which indebtedness was a prior and paramount lien against the properties in his hands; that such indebtedness was constantly increasing; and that he believed a reconciliation and agreement among the parties concerned was impossible. Subsequently, on March 5, 1906, the International Trust Company appeared and answered the cross-complaint of defendants. It admitted the execution of the mortgage deed of trust, and further alleged that it at no time ever consented, acquiesced in, approved, or ratified any action of the receiver in borrowing money or incurring indebtedness, on receiver's certificates or otherwise, in the administration of the estate, and that none of the money borrowed by the receiver was ever used or went toward the betterment of the properties, or was necessary to preserve the status thereof, but that whatever moneys were expended were improvidently and illegally applied to exploiting and developing a number of contingent, speculative, and uncertain mining prospects and locations, and in the promotion of a speculative, uncertain, and contingent mining business; that the indebtedness incurred by the receiver was not in equity a primary lien against said properties, and that any orders of court had authorizing the borrowing of such funds were made and entered ex parte, without notice to the defendant the International Trust Company, and that it had never had its day in court with reference thereto; that it at no time consented or agreed to any subordination of its rights under said mortgage deed of trust to any of the rights arising from the issuance of such receiver's certificates, or any of them, wherefore, it prayed that the receiver should account and the court adjudicate upon the orders previously made permitting receiver's certificates to issue, and that the relative rank of such receiver's certificates should be established by an order and decree of the court, and that the mortgage deed of trust of the defendant trust company should be declared a valid subsisting first lien upon the property in the hands of the receiver, and that the same should be foreclosed and the property sold in accordance with the prayer of its cross-complaint then filed.

On the same day the International Trust Company filed a petition, praying leave to be permitted to file a cross-complaint for the foreclosure of its mortgage, and to bring in new parties, who, it was alleged, had or claimed some interest in the properties in the hands of the receivers, F. D. Nowell and W. B. Hoggatt. The petition showed, among other things, that the property could

be sold to the greatest advantage as a whole, that its value did not exceed the principal due upon the trust company's mortgage, and that it would be inopportune to place the same upon the market until the title thereto was settled, and the rank of the various claims ascertained and determined.

An order of the court was accordingly entered March 13, 1906, granting leave as prayed and another permitting suit to be instituted against the receivers. It appears by the former order that W. B. Hoggatt was on January 3, 1906, appointed receiver for special purposes. The cross-complaint was filed concurrently with the entry of these orders, and, after reciting the institution of the action by Decker Bros. and the appointment of the receivers, it sets up a cause for foreclosure of the trust company's mortgage, and prays that it be declared a paramount lien to all other claims, and that the properties in litigation be sold for its satisfaction. On the same day of the entry of such orders and the filing of this cross-complaint, namely, March 13, 1906, the court made and entered an order of sale directing that the entire properties of the mining companies be sold as an entirety by a special master, but that no bids should be received for a less sum than $400,000, that the master convey to the purchaser all of the title of the mining companies, freed and discharged of all claims and incumbrances of every kind and nature, and that all liens existing against the properties should follow and attach to the proceeds of sale, provided, however, that if the liens, easements, and rights of way claimed upon said properties by the Alaska Nowell Gold Mining Company, the Nowell Mining and Milling Company, Willis E. Nowell, and Thomas S. Nowell. or any other cloud upon the title to the properties ordered sold, should not be released, discharged, and satisfactorily cleared 10 days prior to the day of sale, then that the court would revoke or extend the order as might appear just and proper. Thereafter, but on the same day and before the order was entered, the trust company filed its objections to such entry, assigning numerous grounds therefor, among which are that the priorities between the different lienholders had not been determined; that certain issues between the mining companies and the trust company on the cross-complaint of the former remained unsettled, no reply having then been interposed; that a certain easement referred to in the cross-complaint of the trust company was a cloud upon the title; and that the properties would be sacrificed if sold prior to the determination of priorities and the settlement of the title. The appeal to this court is prosecuted from the order of sale made and entered as indicated.

Several orders of the court are contained in the record authorizing the issuance of receiver's certificates. The first bears date March 7, 1898, and grants leave to the receiver "to borrow money to pay off the claims for labor against the defendants," in the aggregate sum of $3,000, for the Berners Bay Mining & Milling Company, and $4,000 each for the Northern Belle Gold Mining Company and the Seward Gold Mining Company, and authorizes him to issue his certificates therefor. It was further declared that such certificates, when issued, should be a first lien upon the income and corpus of the property of each of said companies, respectively, in the hands of the receiver. This order was made upon a petition of the receiver; no appearance of any other parties being noted. The second order was entered September 23, 1898, also upon the petition of the receiver; both the plaintiffs and defendants appearing. This granted leave to borrow money upon receiver's certificates for the purpose of developing and preserving the property of the defendants Northern Belle Gold Mining Company and the Seward Gold Mining Company. The amount authorized was $37,500 for each of said companies. It was alike declared, as in the former order, that the certificates should be a first lien upon the income and corpus of the properties of such companies. The third order was a modification of the second. This was made November 21, 1898. The fourth order was entered December 28, 1898, and authorized the receiver to borrow $35,000 for temporary purposes, pending the negotiation of receiver's certificates under the previous order. The fifth was made December 13, 1900, upon the petition of the receiver—no appearance being noted of the parties to the suit—and granted authority to borrow $150,000 on receiver's certificates "to pay the present indebtedness of the receiver, and to make up any deficiency that may arise in developing and operating the Kensington mine and mill over

the gross earnings from such operation." A like declaration is made, as in previous orders, relative to the priority of the lien of such certificates over the lien of all mortgages and trust deeds affecting the property. The order specifies that out of the proceeds of the loan there shall be paid, first, the outstanding receiver's certificates, amounting to $40,000; second, the floating indebtedness of $60,000; and, third, for development purposes, $50,000. And the sixth order was entered October 29, 1901, authorizing the receiver to borrow $190,000 for purposes of like nature as of the next preceding issue, and with like declarations as to priority of liens over other incumbrances.

John J. Boyce, Shackleford & Lyons, and Pillsbury, Madison & Sutro, for appellant.

Curtis H. Lindley and Henry Eickhoff, for appellees.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge, after stating the facts, delivered the opinion of the court.

The essential and ultimate inquiry is whether the court erred in decreeing a sale of the mining properties, in view of the proceedings theretofore had and the administration of the affairs of the defendant corporations under the receivership, and it is important to a clear understanding and solution of the principal question that certain legal principles be first ascertained and determined. As a general rule, "to warrant the interposition of a court of equity by the aid of a receiver, it is essential that plaintiff should show, first, either a clear, legal right in himself to the property in controversy, or that he has some lien upon it, or that it constitutes a special fund out of which he is entitled to satisfaction of his demand; and, secondly, it must appear that possession of the property was obtained by defendant through fraud, or that the property itself, or the income from it, is in danger of loss from the neglect, waste, misconduct, or insolvency of the defendant." High on Receivers (2d Ed.) § 11. See, also, 23 Am. & Eng. Enc. of Law, 1036.

The receiver being an arm of the court, his authority for taking over the properties of the concerns involved, for administering their business affairs, and for issuing receiver's certificates, with a view to obtaining funds for discharging liabilities and obligations incident to the receivership, is but another expression for the authority of the court, without whose orders and directions the receiver is powerless to do anything. A practice has grown up incident to railroad receiverships, which, indeed, has become firmly established by judicial sanction, whereby the receiver is considered to be legally competent under conditions of insolvency, and perhaps for other causes peculiar to the business of public service corporations, to issue receiver's certificates for the purpose of paying labor claims, within prescribed limits as to time, and other incidental and necessary expenses for carrying forward the business of the corporation, so that it may continue a going concern, and thereby to supplant or supersede the liens of mortgage claimants. The reasons, however, for the authority are peculiar to railroad corporations, and to the enterprises in which they engage, the most salient of which are that railroads are quasi public concerns, through which the public interests and convenience, as well as private owner-

ship, are largely subserved, and that a maintenance of the roadway and equipment, and a continuation of the business and operation of the road, are essential to the preservation of the mortgage security. Any person or corporation, in taking and accepting a mortgage upon the property of a railroad, therefore, does so with reference to the law governing such corporations, and with knowledge, presumably, of the legal condition that, for the purpose of keeping the enterprise a going concern, receivers may be appointed and receiver's certificates issued in appropriate cases, which, in their force and effect, will supplant the mortgage, and hence with the understanding that the mortgage lien may be superseded by the necessary expenses for continuing the business and thereby preserving the security of the mortgage. These principles have been established by numerous adjudications in the Supreme Court of the United States. Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339; Barton v. Barbour, 104 U. S. 126, 26 L. Ed. 672; Miltenberger v. Logansport Railway Co., 106 U. S. 286, 1 Sup. Ct. 140, 27 L. Ed. 117; Burnham v. Bowen, 111 U. S. 776, 4 Sup. Ct. 675, 28 L. Ed. 596; Union Trust Co. v. Illinois Midland Co., 117 U. S. 434, 6 Sup. Ct. 809, 29 L. Ed. 963; Wood v. Guarantee Trust Co., 128 U. S. 416, 9 Sup. Ct. 131, 32 L. Ed. 472; Kneeland v. American Loan Co., 136 U. S. 89, 10 Sup. Ct. 950, 34 L. Ed. 379. Neither the rule, nor the reasons which go to its support, have application to corporations engaged in strictly private enterprise. The Supreme Court of the United States has not as yet expressly said this, but it has so strongly observed the distinction in that relation between the two characters of corporations that there is left but little room for conjecture as to what its determination in a case calling for a decision in the premises would be. It is said in Wood v. Guarantee Trust Co., supra, that:

"The doctrine of Fosdick v. Schall has never yet been applied in any case, except that of a railroad. The case lays great emphasis on the consideration that a railroad is a peculiar property, of a public nature, and discharging a great public work. There is a broad distinction between such a case and that of a purely private concern. We do not undertake to decide the question here, but only point it out."

And so in Kneeland v. American Loan Co., supra:

"It is the exception, and not the rule, that such priority of liens can be displaced. We emphasize this fact of the sacredness of contract liens, for the reason that there seems to be growing an idea that the chancellor, in the exercise of his equitable powers, has unlimited discretion in this matter of the displacement of vested liens."

The federal courts, in both the circuit and district, have, however, passed upon the question, and are uniform in holding that a receiver of a private corporation has no such latitude in legal contemplation as it respects the issuance of receiver's certificates as do those of a railroad or public-service corporation, and that his authority for displacing mortgage liens, unless by the consent of the mortgagee, extends only to the necessary expenditures incident to administering the assets and preserving the property from deterioration pending the winding up of the business and the settlement of the receivership. This was held in Farmers' Loan & Trust Co. v. Grape Creek Coal Co. (C. C.) 50 Fed. 481, 16 L. R. A. 603. We quote from the headnote:

"In a suit to foreclose a mortgage on the property of a coal-mining company the court has no power, as against the objection of even a small minority of the holders of the mortgage bonds, to authorize a receiver appointed in the suit to issue certificates which shall be a first lien on the mortgaged property, in order to enable him to continue the operation of the mines."

So in Fidelity Insurance, Trust & Safe Deposit Co. v. Roanoke Iron Co. (C. C.) 68 Fed. 623:

"A court of equity has no power, without the consent of all lien creditors, to authorize the receiver of an insolvent private corporation, whose business is not affected with any public interest, to issue certificates which will be a paramount lien upon its property for the purpose of carrying on its business, unless it be necessary to do so in order to preserve the existence of the property or franchises."

The same doctrine was enunciated in the case of Hanna v. State Trust Co., 70 Fed. 2, 16 C. C. A. 586, 30 L. R. A. 201, wherein it was sought to issue receiver's certificates for the purpose of raising funds whereby to carry out certain contracts of sale of real property with purchasers. And in Newton v. Eagle & Phœnix Manufacturing Co. (C. C.) 76 Fed. 418, it was determined that the court would not order receiver's certificates to issue for the purpose of raising money to pay interest on the bonds of the company, and thus displace existing liens. To the same purpose is Baltimore Building & Loan Association v. Alderson, 90 Fed. 142, 32 C. C. A. 542, wherein the court says:

"In the case of private corporations the court cannot authorize the issue of receiver's certificates for the purpose of improving, adding to, or carrying on the business of the company, without first having the consent of creditors whose liens would be affected thereby."

The state courts are quite as uniform in their enunciation of and adherence to the doctrine. In Merriam v. Victory Mining Co., 37 Or. 321, 56 Pac. 75, 58 Pac. 37, 60 Pac. 997, which involved the operation of mining property, the same as in the case at bar, Mr. Justice Bean, after a review of the adjudications of the courts of the United States touching the authority of the receiver in railroad matters to issue certificates in displacement of mortgage liens, says:

"It will thus be seen that the right of a court appointing a receiver to give priority of payment to unsecured debts over the lien of a mortgage is restricted to creditors of railroads which are public concerns, and is only exercised as to them under special circumstances, and in favor of a particular class of claims."

See, also, Investment Corp. v. Hospital, 40 Or. 523, 64 Pac. 644, 67 Pac. 194, 56 L. R. A. 627.

In the case of Raht v. Attrill et al., 106 N. Y. 423, 13 N. E. 282, 60 Am. Rep. 456, it is held, in effect, that the court, in administering assets through the receiver, is not empowered to displace a mortgage lien by receiver's certificates, except for "expenses of realization, and also certain expenses, which are called expenses of preservation," which may be incurred under the order of the court on the credit of the property. That was a case wherein it was sought to have issued receiver's certificates by which to raise the necessary funds for completing a hotel then in course of construction. A later case is that of International Trust Co. v. United Coal Co., 27 Colo. 246, 60 Pac. 621, 83 Am.

St. Rep. 59. The court there, after having examined many authorities, some of which we have cited, says:

"We are of opinion that, in administering the affairs of an ordinary insolvent private business corporation for which a receiver has been appointed, a court of equity has not the power to authorize the receiver to incur indebtedness for carrying on the business, and to make the same a first and paramount lien upon the corpus of the property, superior to that of prior lienholders, without their consent. While it may, in a proper action, and with the proper parties present, through the instrumentality of a receiver, carry on the business of private corporations or individuals temporarily, and incur obligations therefor that may be made a paramount lien on the corpus of the property, such obligations must have been contracted for, and must relate strictly to, the preservation of the status of the property at the time of the appointment of the receiver."

This is the clearest enunciation of the rule that we have found. In a very late and well-considered case from Idaho the same conclusion is reached. Dalliba v. Winschell, 82 Pac. 107, 11 Idaho, 364.

So that, in the light of these authorities, there can remain no question as to the rule as it relates to private corporations. The court is without authority, except by the consent of the mortgage lienholders, to supplant their liens by receiver's certificates issued for any obligations other than those arising by way of expenditures for realization and for preserving the property while the business is in course of administration under the receivership. It cannot, by its edict, make any debt or obligation a prior lien, unless appropriately entitled thereto under the law governing receiverships.

Now, to the order of sale. From an inspection of the complaint of Decker Bros. it is extremely doubtful whether it states a cause entitling the plaintiffs to the appointment of a receiver. Under the rule above first noted the plaintiffs were required to show that the property of the mining companies constituted a special fund to which they had a right to resort for the satisfaction of their claims, and that the property itself, or the income arising therefrom, was in danger of loss from neglect, waste, misconduct, or insolvency of the defendant companies. Being simple contract creditors only, the property of the mining companies could not be regarded as a special fund for their peculiar protection, and they had a right to resort to it only as other creditors had the right; that is, to reach it through the process of law, by way of attachment or execution, or, in case of insolvency, through a creditors' bill. But there was no insolvency in the present case at the time. At most, there was only danger of the companies becoming insolvent, and this because it was feared that a large number of suits would be instituted, whereby the assets would be wasted and exhausted. This, it must be conceded, was scant cause for the appointment of a receiver. Further than this, it is apparent that the purpose of the appointment was not that the assets of the mining company should be disposed of for the payment of indebtedness and liabilities, but that the properties might be operated as mines, and, presumably, that the claims should be discharged out of the earnings of such operation. Not only does the complaint indicate as much by very strong implication, but the subsequent management and conduct of the parties proves it. The first order obtained, whereby leave was granted for

issuing receiver's certificates, extended no further than to enable the receiver to borrow money for the payment of labor claims without specification as to any particular claim. But the second, fifth, and sixth orders clearly contemplated the development of the mines, as well as their operation. Clearly the court was without authority of law to permit the receiver to conduct the business of the defendant companies in this way, even if the complaint was sufficient to warrant his appointment in the first instance. These orders were probably all entered by the consent and sanction of the defendant companies (although the record is not explicit as to that), which would estop them to deny their validity. But the thing of peculiar moment is that they were made and entered without the appearance or consent of the International Trust Company, although they purport to subordinate its mortgage lien to the lien of the receiver's certificates. This would be the conclusion from the record up to the time of filing the petition of the defendants with a view to having the trust company brought in and made a party to the suit or proceeding. By this petition, and by the answer and cross-complaint subsequently filed by the defendant companies, it is alleged that all such orders were made and entered with the consent and approval of the holders of the bonds. These allegations, however, are specifically denied by the trust company, thus bringing into the record an issue as to the real fact. By the further petition of the trust company for leave to sue the receiver, and its cross-complaint, it appears that the presence of other parties is necessary to a complete determination of the matters at issue; it being shown that such parties are claiming such an interest as beclouds the title to some of the properties. Now, without settling these matters, or determining priorities in any way, the court made and entered the order of sale complained of. The order is one resting in the sound discretion of the court—a judicial discretion, however, not arbitrary, but impartial, to be exercised in obedience to the rules of law.

It is inevitable that all these properties must be sold to satisfy the various demands existing against them, and it is most important that they bring the very highest price in the market. To our minds the questionable irregularity attending the appointment of the receiver, the clear want of authority in the court, first, to authorize the receiver to develop the properties or to operate them for any purposes except for those of realization for the payment of creditors; and, second, to subordinate, without the assent of the mortgage claimants, the lien of the mortgage to that of the receiver's certificates, and the alleged existence of adverse claims undetermined—will stand largely in the way of realizing full value at the sale, and that such value cannot be obtained except under the foreclosure of the trust company's mortgage, which may be required in the original suit, or may be had under the cross-bill of that company filed by leave first granted.

We quite agree with the trial judge (who, it should be said, was not on the bench when the suit was instituted or the orders authorizing the issuance of the receiver's certificates were made and entered) that "eight years is too long for a court to hold a mining property in its custody." The main trouble is, however, that it ever assumed custody in the first instance, and attempted to subordinate the mortgage lien

of the trust company, without its assent, to the supposed lien of receiver's certificates issued wholly without warrant or authority of law. It is manifest that such patent irregularities must necessarily detract largely from the realization of a full or fair value of the properties under a sale had in pursuance thereof.

The decree of the trial court will therefore be reversed, and the cause remanded for such other proceedings as may seem proper.