DECKER BROS. v. BERNER'S BAY MINING CO. et al.

INTERNATIONAL TRUST CO. v. BERNER'S BAY CO. et al.

(First Division. Juneau. April 27, 1907.)

Nos. 603 and 536A, Consolidated.

1. RECEIVERS (§ 29*)—APPOINTMENT—JURISDICTION.

On December 15, 1897, Decker Bros. filed a complaint in the district court upon an open account for $154.65 for goods sold and money paid for the use of the Berner's Bay Mining Company, defendant. The complaint also alleged that the defendant owed large sums to other persons, was employing a large force of men, that many suits were threatened against it, and that it was in imminent danger of insolvency, and prayed for the appointment of a receiver. A receiver was appointed. He resigned on February 12, 1898. On February 11, 1898, F. D. Nowell, for the defendant company, paid the plaintiff's claim, receiving a receipt in full, and on February 12th, on the resignation of the former receiver, he was appointed receiver of all defendant's properties. No answer or other pleading was filed by the defendant, or any other person, and no judgment or decree was entered in the cause. *Held*, that upon the payment of the plaintiff's claim by the defendant the case was closed, the court had no jurisdiction to appoint Nowell receiver, and its only remaining duty was to settle the former receiver's account and dismiss the case.

[Ed. Note.—For other cases, see Receivers, Dec. Dig. § 29.*]

2. CORPORATIONS (§ 555*)—RECEIVERS—APPOINTMENT—JURISDICTION.

A receiver is a mere agency of the court, appointed to assist the court within its jurisdiction, and when the court is without jurisdiction the receiver is without power. A court has no jurisdiction to appoint a receiver for a corporation, either original or auxiliary, except in a pending suit. The dismissal of the bill or the discontinuance of the suit operates to-discharge the receiver. As between the parties to the suit his functions are ended, though he continues to act until he accounts and turns over his trust property.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 555.*]

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

3. ESTOPPEL (§ 2*)—BY RECORD.

An estoppel will not be predicated upon a portion of the record and facts, but upon the whole thereof. All the facts and agreements upon which that waiver was authorized must be considered in determining its character and the authority the trustee had to destroy the lien of the bondholders.

[Ed. Note.—For other cases, see Estoppel, Dec. Dig. § 2.*]

4. RECEIVERS (§ 127*)—CERTIFICATES—LIS PENDENS—NOTICE.

The holder of receiver's certificates is put upon inquiry by the doctrine of lis pendens as to all that has been done in the litigation in which the certificates were issued, and is charged with notice of all subsequent proceedings therein.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 218; Dec. Dig. § 127.*]

5. RECEIVERS (§ 128*)—CERTIFICATES—PRIORITIES.

The Berner's Bay Mining Company issued its mortgage bonds in the sum of $500,000. Afterwards a receiver was appointed to take charge of its property, and with the knowledge and acquiescence of the corporation officials and the bondholders the receiver issued a large volume of receiver's certificates of indebtedness under orders of the court. *Held,* that the certificates were an inferior lien to the mortgage bonds, but that they were a valid claim against the corporation, since they represented money expended in the development, preservation, and betterment of the property with the consent of the corporation.

[Ed. Note.—For other cases, see Receivers, Dec. Dig. § 128.*]

6. RECEIVERS (§ 129*)—CERTIFICATES—PAYMENT—PRIORITIES.

A receiver issued three separate series of certificates, at different times, and under different orders of the court, for developing a mine, carrying on the business of working it, prospecting new ore bodies, and doing the annual assessment work. *Held,* that the certificates must be paid in the order of their issuance, the first series first, the second next, and then the third, and the certificates of each series in the order of issuance.

[Ed. Note.—For other cases, see Receivers, Dec. Dig. § 129.*]

On July 1, 1896, the Berner's Bay Mining & Milling Company, a corporation existing under the laws of the state of

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

Maine, and doing business in Alaska, was the owner of all the real property in litigation in this case, and on that day mortgaged the same to the International Trust Company, of Massachusetts, to secure the payment of bonds in the sum of $500,000, issued and sold for its benefit. Thereafter, and on November 1, 1897, the Berner's Bay Company divided and sold all its property to the Seward Gold Mining Company, the Northern Belle Gold Mining Company, and the Ophir Gold Mining Company; these three corporations assuming the indebtedness of the Berner's Bay Company, but in what proportion or in what manner is not disclosed by the pleadings or evidence. The International Trust Company was not a party to this sale, and does not appear to have ever consented thereto. It does not appear that either of the three purchasing corporations have or had any other property than that so purchased from the Berner's Bay Company.

On December 15, 1897, Decker Bros., merchants at Juneau, instituted an action in this court against the Berner's Bay Company and the three purchasing companies to recover judgment on an account in the amount of $154.65 for goods sold and delivered, and upon checks issued by the defendants and paid by the plaintiffs in the sum of about $3,000. The complaint contained additional allegations that the defendants were employing a large force of men, at an expense of from $12,000 to $15,000 per month; that the output of the mines was insufficient to pay running expenses; that an indebtedness of about $500,000 was outstanding; that many of the creditors were threatening suit, and that the property of the defendant companies was in danger of being wasted and exhausted; that said companies were in imminent danger of becoming insolvent; that, if a receiver were appointed to manage their business under the direction of the court, they would be able to discharge all their indebtedness, but that otherwise they could not; that according to the belief of the

plaintiffs, if the property of the defendants was put up at forced sale, there would not be realized a sum sufficient to meet the liabilities. Wherefore plaintiffs pray the appointment of a suitable person to take charge of the property of the defendants and to manage the business of the defendant corporations, and for the payment of plaintiffs' demands during the course of such receivership.

Service of a copy of the complaint and summons was made on Willis E. Nowell, superintendent of the Berner's Bay Company, on December 15th, and on that day Malony & Winn, attorneys, appearing for the defendant corporations the court (Hon. Charles S. Johnson, judge) made an order appointing E. F. Cassel receiver of all the property of the four defendant corporations. Two months after his appointment, on February 12, 1898, Cassel resigned his trust as receiver, and on the same day Frederick D. Nowell was appointed in his place. Prior to the appointment of Nowell, and on February 11, 1898, Frederick D. Nowell paid Decker Bros. in full for the demands held by them, mentioned in their complaint, and upon which the action and receivership were based. No demurrer, answer, or other pleading was made or filed in that cause by the defendants, or any of them, directed to the Decker Bros.' complaint, prior to payment or since. No other complaint was filed in the cause by any one, and after the payment of Decker Bros. no further appearance was made in the case by any one as plaintiff or defendant in the original action.

Frederick D. Nowell took charge of the property of the four corporations as receiver on February 12, 1898, and began active operations in the management thereof as a mining business. It was a financial failure, and application was made to the court (Charles S. Johnson, judge) for, and he granted, leave to issue receiver's certificates to enable the receiver to continue the business of mining and to develop

and prospect the undeveloped veins. Several issues of re-
ceiver's certificates were issued under authority of Judge
Johnson's orders, but they were all retired when the first
issue was made as next detailed.

On October 29, 1901, this court (M. C. Brown, judge)
authorized the receiver to borrow $190,000, and to issue
receiver's certificates therefor, "to pay the present indebt-
edness of the receiver and to make up any temporary defi-
ciency that may arise in developing and operating the Ken-
sington mine and mill, over the gross earnings from such
operations," and, further, "such certificates to be payable in
gold coin of the United States two years from and after
date, and to bear interest at a rate not exceeding 8 per cent.
per annum from and after October 14, 1901, payable annu-
ally," etc. The court further ordered:

"That said certificates be and are a first lien upon the mines; min-
ing claims, mill, water rights, railway, and properties of every kind
and description of said companies, now under the control of the
court, and shall be prior to and paramount to any and all mortgages,
trust deeds, and indebtedness whatsoever existing against said com-
panies, and said certificates shall be further secured by and constitute
a lien upon all products and earnings from the operations of said
properties of said receiver, and obligations incidental to the receiver-
ship; the lien of all said certificates being of equal rank together."

The order provided for the payment and retirement of all
previous issues of certificates, and they were all paid and
retired. No part of the $190,000 so issued has been paid,
and they are all outstanding at this time, and are known in
this case as the "first issue" certificates.

The "first issue" was soon exhausted, and the receiver ap-
plied for authority to issue and sell the "second issue" of cer-
tificates. On November 21, 1902, this court (M. C. Brown,
judge) ordered that the receiver "is hereby empowered and
authorized to borrow, at not to exceed 8 per cent. per an-
num, said sum of $60,000, and to issue receiver's certif-

icates therefor, in such denominations and at such times as he may find necessary and most convenient; that certificates for the sum of $25,000 may be issued immediately, and the balance of said $60,000 upon the further order of this court, upon a further showing to be made in this behalf." The court further ordered:

"That said certificates be and are a first lien upon the mines, mining claims, mill, water rights, railway, and properties of every kind and description of said companies, now under the control of the court, and shall be prior to and paramount to any and all mortgages, trust deeds, and indebtedness whatsoever existing against said companies, save and except all certificates heretofore issued, which shall be equal in all respects, and said certificates shall be further secured by, and constitute a lien upon, all products and earnings from the operations of said properties by the receiver and obligations incidental to the receivership, the lien of all said certificates being of equal rank together."

These certificates were to run from January 1, 1903, for one year, and drew interest at 8 per cent. per annum. The sum of $34,173.59 in certificates of the "second issue" were sold, and are yet outstanding and unpaid.

On January 30, 1905, this court (Royal A. Gunnison, judge) authorized the sale of the "third issue" of receiver's certificates in the sum of $29,861.99, to pay for prospecting the mines under what is known in this case as the "MacDonald contract." That order provides:

"That the said certificates when issued shall be a lien upon said property in the hands of the receiver, the same as all other certificates except as specially otherwise ordered by the court, and shall be payable when the said Joseph MacDonald shall exercise his option under the said contract and elect to take or reject said properties under the said contract of May 13, 1904."

This "third issue" of certificates was sold, and is yet unpaid, in the sum of $29,861.99.

On July 20, 1905, this court (Royal A. Gunnison, judge) authorized the receiver to issue another certificate to Joseph Mac-Donald, in full for his contract of development work at the mines, in the sum of $3,765.25, and that certificate is unpaid. It does not appear to have any authority as a prior lien.

No payment has ever been made on the bonds or the interest thereon, and no payment has been made on the receiver's certificates herein mentioned, nor on the interest, and the whole is long since due.

After the payment of Decker Bros.' claim on February 11, 1898, upon which the original suit was based, no other pleadings were filed in the case by any one till May, 1904, when an intervening petition was filed by the First National Bank of Juneau, and four other certificate holders. In June, 1904, Gillispie, Fairchild, and Corning, who alleged that they were also interested as bond and certificate holders, intervened, praying for the removal of the receiver and other relief. Thereafter the International Trust Company was made a party defendant to the original suit, and on March 5, 1906, it entered its appearance therein, and filed its cross-complaint, praying for the foreclosure of its mortgage, and that the lien of the mortgage be decreed to be prior to that of the receiver's certificates.

Thereafter and on March 13, 1906, the International Trust Company, trustee for the bondholders, began a separate suit in this court, No. 536A, as plaintiffs, against the Berner's Bay Company and the allied corporations mentioned in the old suit, the Nowell Mining & Milling Co., the Alaska Nowell Gold Mining Co., Thomas S. Nowell, Willis E. Nowell, F. D. Nowell, individually, and F. D. Nowell and W. B. Hoggatt, as receivers in the old action, to foreclose its mortgage on the bonds and property sold to it on July 1, 1896, and prayed in addition to foreclosure that the lien of its bonds be decreed to be a prior and paramount lien upon the property mortgaged.

The defendants named in this bill of foreclosure answered, on April 6, 1906, that the plaintiff ought not to have and maintain the action because of the pendency of the prior old suit of Decker Bros. v. Berner's Bay Co. et al. Upon motion of the International Trust Company this court on April 9, 1907, consolidated the old case No. 603, and all intervening issues therein, with the last-named suit, No. 536A, and the subsequent trial was had upon the consolidated cause.

The main issue on the trial was conceded by all parties to be the right of priority between the mortgage bonds and the receiver's certificates, and incidentally the priority between the three issues of receiver's certificates. The objections to Receiver Nowell's accounts were also heard, and the settlement of the final report and account of Receiver McBride.

The International Trust Company relied upon its mortgage as a first and paramount lien over the subsequent receiver's certificates. A portion of the certificate holders pleaded and sought to establish an estoppel against the bondholders, in support of their prior right of lien.

Some, if not all, of the bondholders, whose trustee the International Trust Company was, knew of the issuance of the various issues of receiver's certificates and consented thereto. Prior to the order of October 29, 1901, authorizing the $190,-000 or "first issue" of certificates, bondholders subscribed $45,-000, to be, and which was, invested therein as issued, as follows: Thomas Stokes, $20,000; D. L. Webster, $10,000; Henry Endicott, $10,000; and Edw. Hobart, $5,000. Of that first issue the following bondholders purchased certificates in the following amounts: Thomas Stokes, $25,000; D. L. Webster, $10,000; Henry Endicott, $28,431.11; Wallace Hackett, $11,912.94; F. L. Slade, $2,000; F. S. Landon, $1,000; and George K. McLeod, $3,000. Of the "second issue" Wallace Hackett purchased certificate No. 2, for $15,996.29.

On February 26, 1903, Thomas S. Nowell, and Fred D.

Nowell and Willis E. Nowell, his sons, sought to sell the mining property in controversy, and in which they claimed an equity as mortgagors, and to that end entered into a contract with Wallace Hackett, an Eastern bondholder, to procure the deposit with Hackett of all the bonds for that purpose. That contract recites that the bondholders are the parties of the first part, "and Wallace Hackett, of Portsmouth, N. H., trustee, herein designated as the party of the second part; and Thomas S. Nowell, Frederick D. Nowell, and Willis E. Nowell, all of Juneau, Alaska, parties hereto of the third part." The contract recites the issue and sale of the bonds, the nonpayment of interest, the appointment of the receiver, and then:

"And, whereas, under authority of said court, said receiver has issued, from time to time, evidences of indebtedness of said corporation, in the form of receiver's certificates, which aggregate upward of two hundred thousand ($200,000) dollars."

And other recitals of general character showing a promise of sale by the Nowells, and then:

"Now, therefore, be it known that the parties hereto, in view of securing the results above set forth, hereby agree with each other as follows, to wit:

"First. The bondholders will deposit their bonds with Wallace Hackett, of Portsmouth, N. H., who will act as trustee for the purposes hereinafter described and issue his receipts for the bonds deposited with him. The acceptance of such receipts on the part of the bondholders shall constitute the assent of said bondholders to this contract and the terms thereof.

"Second. The parties hereto of the third part shall provide for the prompt payment of the receiver's certificates of indebtedness and interest thereon to the full satisfaction of the United States District Court, and shall obtain the discharge of said corporation from the custody of said court as above described. * * *

"Fifth. While it is not the purpose of this contract to bind the parties of the third part to the performance of this paragraph exactly as it is herein written, but under the necessities of the case some leeway for changes in the negotiations must necessarily be granted to said parties of the third part, still it is the intention and purpose of

the parties of the third part hereto to negotiate a contract for the sale of the above properties with a syndicate of substantial worth, and to receive in payment thereof enough money to discharge the receiver's certificates and interest thereon now outstanding; also that the purchasing syndicate shall erect a mill of the capacity of one thousand (1,000) tons per day."

And further agreements contemplating a reorganization to be accomplished by the Nowells under that contract. The contract further provides that:

"Said trustee is hereby vested with full authority to proceed with the foreclosure of the mortgage now on said Berner's Bay properties and secured by the mortgage bonds above named, should such step prove necessary. And, furthermore, said trustee is vested with full authority to do and perform all things necessary for the purpose of carrying out this contract so far as it devolves upon him."

Wallace Hackett then addressed a circular letter to the bondholders, inclosing a copy of the foregoing contract, and requesting them to deposit their bonds with him in aid of the reorganization under the terms of that contract. The Nowells, third party thereto, also sent out a circular letter to the bondholders, dated March 14, 1903, urging the bondholders to so deposit their bonds with Hackett under that contract. Out of the total 500 bonds, 498 were so deposited with Wallace Hackett under those conditions and upon the representations contained in that contract. He deposited security for the other two with the International Trust Company, and represented the whole issue in the attempted sale of the mortgaged mines.

Under this agreement, and on May 13, 1904, the Nowells entered into a contract with Joseph MacDonald for the sale to him of the mines, if upon his examination and development work he should elect to purchase them. The receiver, Frederick D. Nowell, in that contract with MacDonald, agreed that all development work should be paid for with receiver's certificates in case MacDonald declined to purchase. On July 1,

3 A.R.—19

1904, the receiver, Frederick D. Nowell, in his report to the court reported the MacDonald contract, that the work was then progressing, and also reported and filed in the court records a waiver of Wallace Hackett, dated June 13, 1904, of the bondholders' priority of lien, omitting the caption, as follows:

"Whereas, the holders of the bonds of the defendant companies, in the above suit, viz., the Berner's Bay Mining & Milling Company, the Northern Belle Gold Mining Company, the Seward Gold Mining Company, and the Ophir Gold Mining Company, did consent to the issuance of the receiver's certificates in this cause and the orders of the court allowing and giving such certificates priority over the mortgage bonds of said companies, but such consent never formally entered of record herein:

"Now, for the purpose of making such consent a matter of record, I, Wallace Hackett, for myself and as trustee and holder of said bonds, shown in the list hereto attached, do hereby consent to and waive any and all objections to the orders of the court herein authorizing said certificates and further issues thereof, and giving the same priority over said bonds.

"[Signed]                                    Wallace Hackett."

Wallace Hackett also wrote letters to the same general effect to the Nowells, all of which are in the record. MacDonald prospected the mines by cross-cutting and boring the Kensington tunnel, and then elected not to purchase under his option with the receiver. On January 30, 1905, this court (Royal A. Gunnison, judge) authorized the "third issue" of receiver's certificates in the sum of $29,861.99, to pay for that work, and that effort to sell the property failed. No other authority from the bondholders to Wallace Hackett for making the waiver of their rights of priority is shown by the evidence in this case than the recitals and terms of the contract of February 26, 1903.

None of the bondholders have been made parties to this litigation, or appeared therein, except as their interests are represented by the International Trust Company. The International Trust Company was not a party to this litigation till,

upon petition of the defendants on July 13, 1905, it was made a party to the original suit. Thereafter, and on March 13, 1906, it brought a separate suit, No. 436A, to foreclose the mortgage held by it to secure the payment of the bonds for which it was trustee. Other facts are stated in the opinion.

Malony & Cobb, for Nowell, receiver, the Nowells, and all corporation defendants.

William A. Barnhill, for Receiver McBride.

Shackleford & Lyons, for International Trust Co.

Winn & Burton, for certificate holders.

WICKERSHAM, District Judge. The principal issues of law in this case were determined, on February 11, 1907, by the Circuit Court of Appeals, on an appeal from a former decree of this court ordering the sale of the property in litigation. International Trust Co. v. Decker Bros. et al., 152 Fed. 78, 81 C. C. A. 302, 11 L. R. A. (N. S.) 152. The cause has now been fully heard on the merits, and, while the facts are now amplified and fully stated, the law announced on the former appeal is still fully applicable thereto and settles most of the contested issues.

Objection is made to the jurisdiction of this court in the original case of Decker Bros. v. Berner's Bay Co. et al. That objection is based, as it was on the former appeal, upon the want of a sufficient statement of facts in the original complaint, and also upon the failure of jurisdiction, even if the complaint was good, by the payment of the Decker Bros. claim and their withdrawal from the case. The complaint of Decker Bros., upon which the receivership was based, was filed in this court on December 15, 1897, upon an open account for goods sold to and money paid for the use of the defendants. This account was fully paid and satisfied by Frederick D. Nowell on February 11, 1898, and never since that day did those plaintiffs have any interest in the suit. They did not again appear in the

case. No answer had then been made to their complaint, and no judgment was ever entered thereon. When the money was paid, a receipt in full was given for their demands, and from that moment there was no plaintiff in the case, and conse-quently no defendant—no parties litigant. The case was closed, so far as the cause of action sued on was concerned, and the only duty remaining to the court was to settle the re-ceiver's accounts as they stood on that day and dismiss the suit. The Holladay Case (C. C.) 29 Fed. 226, 236.

On the next day, February 12, 1898, however, Frederick D. Nowell was appointed receiver of the property by the court and entered upon that service, and continued to exercise the functions of a receiver thereof, without plaintiff or defendants, in the case where no issue of law or fact was involved, until May 13, 1904—more than six years—when the next litigant appeared by the filing of a petition by the First National Bank of Juneau and other receiver's certificate holders. Thereafter other certificate holders and claimants of equities in the prop-erty intervened, and finally, on March 5, 1906, the Interna-tional Trust Company appeared in pursuance to proceedings to make it a party, and prayed for the foreclosure of its mort-gage. . Every receiver's certificate in controversy in this suit was issued prior to that date; the last being issued on July 20, 1905.

Jurisdiction is the power to hear and determine. Simmons v. Saul, 138 U. S. 454, 11 Sup. Ct. 369, 34 L. Ed. 1054. The Circuit Court of Appeals expressed grave doubt whether this court had jurisdiction, under the allegations of the Decker Bros. complaint, while plaintiffs were before the court in a pending suit upon a legal cause of action. When the demand was, on February 11, 1898, paid in full by Frederick D. No-well, for the defendants, and both plaintiffs and defendants discontinued their litigation, what jurisdiction remained? A receiver is a mere agency of the court, appointed to assist the

court within its jurisdiction, and when the court is without jurisdiction the receiver is without jurisdiction. A court has no jurisdiction to appoint a receiver for a corporation, either original or auxiliary, except in a pending suit. Sections 1060, 1061, Hill's Ann. Laws Or. 1892; section 753, Code Civ. Proc. Alaska (Carter's Codes, p. 300); Mercantile Trust Co. v. Kanawha Ry. Co. (C. C.) 39 Fed. 337; In re Brant (C. C.) 96 Fed. 257; Greene v. Star Cash Co. (C. C.) 99 Fed. 656; Merchants' Bank v. Kent Judge, 43 Mich. 292, 296, 5 N. W. 627; Jones v. Schall, 45 Mich. 379, 380, 8 N. W. 68; Jones v. Bank of Leadville, 10 Colo. 464, 17 Pac. 272, 276; Hottenstein v. Conrad, 9 Kan. 435, 438; High on Receivers, §§ 3, 5, 6, note 2. The dismissal of the bill or the discontinuance of the suit operates to discharge the receiver. As between the parties to the suit his functions are ended, though he continues to act until he accounts and turns over his trust property. 23 Am. & Eng. Ency. of Law (2d Ed.) "Receivers," p. 1131; 17 Ency. of Pl. & Pr. 687, notes 1 and 2; Beach on Receivers (Anderson's Ed.) 796; The Holladay Case (C. C.) 29 Fed. 226, 236.

The real controversy on the trial of this cause has rested upon the plea of estoppel raised by the allegations of the former receiver, and the certificate holders against the bondholders. The former receiver, Frederick D. Nowell, in his answer to the objections of the International Trust Company to the allowance of his claims as receiver, alleges:

"That in issuing the receiver's certificates mentioned in said objections, he acted with the knowledge, advice, and consent of the bondholders, and with the knowledge and consent of the International Trust Company, and used the proceeds thereof in paying the expenses of the administration of said estate and in bettering said properties."

The present receiver makes practically the same or stronger allegations of consent and estoppel, while all the defendant corporations and all certificate holders who are not bondhold-

ers join in that defense. The waiver of the priority of the
bondholders' lien filed by Wallace Hackett on June 13, 1904,
is, of course, the principal ground of estoppel presented in evi-
dence. The first and second issues of receiver's certificates
were authorized, issued, and sold long prior to the execution
of that waiver, and under the well-known principles of es-
toppel the subsequent waiver was not a sufficient act of es-
toppel. The prior holders were not induced by that waiver to
purchase the certificates, to part with their money, or to do or
refrain from doing any act to their loss or damage. The third
issue—the MacDonald issue—was authorized subsequent to
the filing of that waiver, and if the facts are sufficient to con-
stitute an estoppel against the bondholders, this issue may claim
the benefit thereof.

That waiver was filed by Hackett, to use the words of the
instrument "for myself and as trustee and holder of said
bonds." With it he filed a list of the bondholders and the
number of bonds held by each, and thus his individual holding
and the amount he represented as trustee was clearly dis-
closed on the face of the record. It appeared therefrom that
he was the owner of 27 bonds and the trustee for 473.

An estoppel will not be predicated upon a portion of the
record and facts, but upon the whole thereof. All the facts
and agreements upon which that waiver was authorized must
be considered in determining its character and the authority
the trustee had to destroy the lien of the bondholders. The
contract between the bondholders and Hackett and the No-
wells, of February 26, 1903, was the basis for the creation of
the Hackett trusteeship. That contract was sent to each
bondholder with a copy of Hackett's letter of explanation of
March 31, 1903. At the same time the Nowells, the other
party to the agreement, sent out their circular letter of March
14, 1903. These communications invited the bondholders to
deposit their bonds with Wallace Hackett as trustee for the

purpose of making a sale, and purported to give them the full and complete terms upon which they and all parties were to act in that matter. That contract provided that in the plan of sale and reorganization proposed thereby the Nowells "shall provide for the prompt payment of the receiver's certificates," and that they should obtain the discharge of the Berner's Bay Company and allied corporations from the custody of the court. The contract further provided that it was the purpose and intention of the Nowells "to negotiate a contract for the sale of the above properties with a syndicate of substantial worth, and to receive in payment thereof enough money to discharge the receiver's certificates and interest thereon now outstanding, also that the purchasing syndicate shall erect a mill of a capacity of one thousand (1,000) tons per day," and that a general reorganization by the creation of a new purchasing corporation should be created to take over all the property. It was a scheme to sell the properties to new people with money sufficient to pay the receiver's certificates and to put in a largely increased capital stock, and make the bonds outstanding good, instead of destroying them. No power was given to Wallace Hackett by that contract, or suggested in his or the Nowells' circular letters of advice to the bondholders, to waive the priority of lien of the bondholders. He was not given any authority to consent to the issuance of receiver's certificates having priority over the bonds; but a fair construction of the power, a full consideration of the whole arrangement, conclusively proves that his duty and power was to protect the bonds and their then present status. True, he was given "full authority to do and perform all things necessary for the purpose of carrying out this contract so far as it devolves upon him"; but that must be construed in connection with the clause providing that the Nowells "shall provide for the prompt payment of the receiver's certificates."

The Nowells were a party to that contract, and at the same

time the representatives of the Berner's Bay and allied mining corporations, and all these were bound to know and did know the limitation upon Hackett's power. The first and second issues of receiver's certificates had been issued and sold long prior thereto, and were therefore not aided by any estoppel created by the Hackett waiver. In pursuance to the acquiescence of the bondholders by filing their bonds with Hackett and the Nowells, the latter, for the five allied mining corporations, entered into a contract with Joseph MacDonald to run the Kensington tunnel, etc., and then to elect whether he would, or not, purchase the mines upon the terms mentioned in the contract dated May 13, 1904. There is no provision in the MacDonald contract, nor in the order of this court of May 15, 1904 (Judge Brown), authorizing the receiver to enter into it by his signature, promising the MacDonald certificates afterwards issued under it any priority over the bonds of the former issues of receiver's certificates. Upon all the facts and agreements upon which the MacDonald or "third issue" certificates were authorized and paid out, it is my judgment that Hackett had no power to make his waiver of priority and to subordinate the lien of the bonds to that of the MacDonald or any prior issue of certificates. It must be noticed, also, that while the MacDonald contract was signed by MacDonald and entered into on May 13, and authorized by this court on May 15, 1904, the Hackett waiver was not signed and executed until June 13, 1904, a month later. It cannot, therefore, be held to have been an inducement to that contract, or to the acceptance of the MacDonald issue of certificates under that contract. It was a gratuitous and unauthorized destruction of the trust imposed in Wallace Hackett by the bondholders, and, being without power, and that fact known to all those who took certificates under the MacDonald contract, it does not constitute an estoppel to the priority of the lien of the bonds over the receiver's certificates. The numerous letters from Wallace

Hackett to the Nowells add nothing to the estoppel, since he had no authority from the bondholders to bind them in that way. The holder of receiver's certificates is put upon inquiry as to all that has been done in the litigation in which the certificates were issued, and is charged with notice of all subsequent proceedings therein. The doctrine of lis pendens would charge any one who dealt with property of these corporations through the court, pending the litigation, with notice of the litigation, and the order thereof, and the whole of the proceedings therein. Mercantile Trust Co. v. Kanawha Ry. Co., 58 Fed. 17, 7 C. C. A. 3.

It is my judgment, however, that the receiver's certificates are not void, but are a valid obligation of the Berner's Bay Mining & Milling Company, and their allied corporations, which then owned and now own the equity of redemption in the property of the Berner's Bay Company. They were issued by Frederick D. Nowell, with the knowledge and consent of those corporations and their officers, and for the benefit of their property. Even if he had no authority as receiver, he had authority as the agent and representative of those corporations (The Holladay Case [C. C.] 29 Fed. 226, 236), and admittedly issued the certificates in payment for development and annual assessment work done on them. Then, too, those certificates were issued under the orders of this court entered at prior terms of this court years ago, and no attempt has been made to obtain relief against the same under the provisions of section 93 of the Code of Civil Procedure (Carter's Codes, p. 163), or at all. It is doubtful if this court may now vacate said orders, or even treat them as void.

The first issue of $190,000 was sold upon the distinct agreement that it was a prior and paramount lien upon the corporation property. It was sought to put the second issue in the same rank—to displace the prior lien of the first issue by giving to the second an equal rank therewith. There was no attempt

in the final order authorizing the third issue to give the Mac-Donald certificates rank with the first and second issues. The takers of the second issue knew of the status given to the first issue, and must be held bound thereby. Union Trust Co. v. Illinois Midland Co., 117 U. S. 434, 436, 6 Sup. Ct. 809, 29 L. Ed. 963. The rights of the holders of these different issues of receiver's certificates are analogous to those of prior and subsequent mortgages. In the last case cited the court quoted Mr. Justice Harlan with approval, as follows:

"Those who take receiver's certificates must be deemed to have taken them subject to the rights of parties who have prior liens upon the property, and who have not, but should have been, brought before the court. While the court, under some circumstances and for some purposes, and in advance of the prior lienholders being made parties, may have jurisdiction to charge the property with the amount of receiver's certificates issued by its authority, it cannot, without giving such parties their day in court, deprive them of their priority of lien. When such prior lienholders are brought before the court, they become entitled, upon the plainest principles of justice and equity, to contest the necessity, validity, effect, and amount of all such certificates, as fully as if such questions were then, for the first time, presented for determination. If it appears that they ought not to have been made a charge upon the property, superior to the lien created by the mortgages, then the contract rights of the prior lienholders must be protected. On the other hand, if it appears that the court did what it ought to have done, even had the trustee and the bondholders been before it when the certificates were authorized to be issued, the property should not be relieved from the charge made upon it, in good faith, for its protection and preservation."

Evidence is offered and argument presented to the court seeking to erect an estoppel against Thomas Stokes, D. L. Webster, Henry Endicott, Wallace Hackett, F. L. Slade, F. S. Landon, and Geo. K. McLeod, individually, because of the fact that they purchased certificates and waived the priority of their bond liens thereby. The answer to that is that none of these persons are made parties to this suit, no issues are presented

in the pleadings upon which they were required to come before the court, they have not individually had their day in court, and no judgment ought to go against them without notice.

Objections to the allowance of certain items in the receiver's accounts of Frederick D. Nowell, former receiver, for salary and expenses, and for certificates issued by him to Nathan Greene, his bookkeeper, and other employés, and to Thomas S. Nowell and Willis E. Nowell, for moneys, expenses, salaries and claims, are made by the International Trust Company, and evidence produced to show that the receivership was conducted in the interest of the Nowells, and unnecessarily prolonged for ten years for speculative purposes, and that certificates were issued by the former receiver for carrying on the business of the corporations and prospecting and developing mines. All such objections are overruled and denied. The allegations are true in a general sense; but the trustee, the International Trust Company, and the bondholders, are quite as much or more to blame for the extraordinary length of the receivership in this case as the receiver. If that trustee had performed its plain duty to its bondholders, or if they had moved it to act, as they had the right to do, this suit would have ended ten years ago just where it must end now—by the foreclosure of the mortgage. It has been pressed upon the court by counsel for the International Trust Company that the law was well settled and well known prior to the appointment of the former receiver that he was without authority to carry on the trust for so long a period and under such circumstances. That contention is entirely correct, but that law affected the trust company with equal or greater force than it does Receiver Nowell. He had the interests of his own corporations and those of the equitable owners thereof, subject to the mortgage, in his keeping. He acted in open daylight, and neither the trust company nor the bondholders can claim that they were

without knowledge of his acts. Both sides, however, have this fair excuse for the long delay: That they were seeking a means of extracting this property from its insolvent condition and putting it into shape to work and pay the bondholders and all its obligations. In my judgment, all parties in interest are equally responsible for the long delay in closing this trust. Neither the receiver, Nowell, nor those who own and represent the four original corporations, ought to be specially punished for what the bondholders and the International Trust Company could have prevented at any time. Since the Circuit Court of Appeals, in the former appeal in this case, has declared that the bonds constitute a prior lien upon the mortgaged property over the receiver's certificates, the International Trust Company has no such interest as enables it to defeat the payment of the receiver's certificates out of the surplus belonging to the mortgagors. The former receiver's reports will be approved, and the objections to the payment of the certificates overruled.

The report of the present receiver will also be approved, with this exception: Receiver McBride will be allowed $250 per month salary, and his attorney $250 per month salary, both to be paid as costs of litigation.

The petition of John H. Cobb for an allowance of $20,000 for services for the former receiver is denied. He acted as attorney for the receiver under a written contract for $1,500 per annum, and this court cannot increase the amount, though it might think the contract price insufficient.

The petition of Shackleford & Lyons and John J. Boyce to be allowed $5,000 by the present receiver for services in the Johnson suit is denied. They may file their lien on the judgment in that suit for the settlement of their claim for services therein.

The present receiver has a sum of money in his hands, paid by the International Trust Company, to pay for annual assess-

ment work on unpatented mines. He will pay that money to Shackleford & Lyons, and they will pay for such annual assessment work therefrom. Thereupon the present receiver and all his employés will be discharged and his bond exonerated.

A petition of the special master for compensation and payment of claims for publishing notices of sale is allowed. Each of the charges for publication of the notice of sale is allowed, and the master will be allowed the sum of $————, to be taxed as costs in this case.

A decree may be prepared, adjudging the bonds, in the sum of $500,000, and the interest thereon to date, to be a prior and paramount lien upon all the mortgaged premises, which shall be sold by the marshal in accordance with the law to pay the same; but the accounts and salary of the present receiver, McBride, his attorney, Wm. A. Barnhill, and the costs of this case, shall be first paid.

The receiver's certificates shall be decreed to be a subsequent lien to the mortgage bonds and costs, on the property mortgaged, and there may be a decree that they be paid out of said property after the bonds and interest and costs are first paid. The first series of bonds and interest shall be first paid, the second series and interest shall then be paid, and the third series and interest shall then be paid. The said issues shall be paid in the order of issuance according to the contract of issue.

All general indebtedness subsequent to the last issue of receiver's certificates will be paid from any fund left after paying the said prior certificates, and in proportion and in equal rank. In so far as Receiver Frederick D. Nowell has received certificates, he will be paid as they are paid; for any general claim for salary and expenses, not covered by certificates, he will be paid after all certificates are paid; and the same rule will apply to any claims held by Thomas S. Nowell and Willis E. Nowell, Malony & Cobb, attorneys, or either of them, or any other general creditor.

The International Trust Company may bid on the sale of the mortgaged property, and the bonds and interest to the full amount may be accepted in payment. If their bid exceeds the amount of the bonds and interest, the excess shall be paid into court in cash, to be applied upon the receiver's certificates and other subsequent indebtedness according to the contract of issue. If any other person or corporation shall bid the greater amount, the sum so bid and accepted shall be paid into this court, to be applied in payment as herein ordered.

The court will cover any matter not noticed in the decree. Let findings of fact, conclusions of law, and decree be prepared in accordance with these suggestions.