## BOWEN v. HOCKLEY et al.

### No. 3581.

Circuit Court of Appeals, Fourth Circuit.

June 11, 1934.

H. Hamilton Hackney and Washington Bowie, Jr., both of Baltimore, Md., for appellant.

G. Ridgely Sappington, of Baltimore, Md. (Wilson K. Barnes, of Baltimore, Md., on the brief), for appellees.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

PARKER, Circuit Judge.

This is an appeal from an order denying a petition that the receivers of the Davison Chemical Company be directed to continue the payment of weekly compensation awarded against the company by the State Industrial Accident Commission of Maryland. Petitioner's husband died as the result of injuries received in the service of the company, which was a "self-insurer" under the Maryland Workmen's Compensation Act, and on January 30, 1932, an order was entered by the State Industrial Accident Commission awarding her under the act the sum of $5,000, or $18 per week for 277⅝ weeks beginning December 15, 1931. The compensation thus awarded was regularly paid by the company until February 13, 1933, when it was placed in the hands of receivers in a suit brought by a general creditor and a stockholder; but, although its business has been continued since that date by the receivers appointed, no further payments of compensation have been made to her. She filed petition on July 1, 1933, asking that the receivers be required to continue the payments. The court denied the petition on the ground that the Maryland statute gave no lien or preferential status to awards of compensation, and petitioner has appealed.

The statute in question, Bagby's Annotated Code of Maryland 1924, article 101, § 15, provides three optional plans for securing the payment of compensation awards to injured employees: (1) Insurance in the state accident fund, (2) insurance by private corporate insurers, and (3) the furnishing of satisfactory proof to the commission of the employer's financial ability to pay such compensation himself, in which case the commission may require him to deposit securities to secure his liability for the payment of the compensation specified under the act. No provision of the act gives any lien for the compensation awarded or any priority against the assets of an insolvent. The company here proceeded under the third provision and gave a bond, which is said to be inadequate to cover all the claims for compensation of injured employees.

As stated above, receivers were appointed for the company on February 13, 1933, on a bill filed by a general creditor and a stockholder. The bill alleged that the company had an outstanding indebtedness of exceeding $9,000,000, which it was unable to pay in the ordinary course of business, but averred that it had property of a value more than sufficient to pay its debts if the business were continued as a going concern. It was further averred that if the property of the company were sold under executions to satisfy the claims of creditors, it would not bring its true value or a sufficient amount to satisfy the claims of creditors, and that it was to the interest of creditors and stockholders to have the business of the company continued by receivers of the court and its going concern value thus preserved until such time as it could be sold as an entirety. The company filed answer admitting the allegations of the bill and consenting to the appointment of receivers as prayed; and an order was entered appointing receivers, empowering them to continue the operation of the business, enjoining interference with the receivership estate, and containing generally the provisions usually embodied in orders creating an operating receivership.

From this statement of facts it will be seen that the question presented to the court is, not whether a claim for compensation is entitled to preference or is provable in bankruptcy, as in Lane v. Industrial Commissioner (C. C. A. 2d) 54 F.(2d) 338, 86 A. L. R. 765, or whether such claim is entitled to preferential payment in a distribution of assets, as in T. H. Mastin & Co. v. Pickering Lumber Co. (D. C.) 2 F. Supp. 605, but whether receivers appointed for the purpose of operating a business and conserving its value as a going concern should be required to continue making compensation payments awarded against the business as a self-insurer by a Workmen's Compensation Commission. The answer to this question must depend upon the nature of compensation payments and the powers of courts of equity in receivership proceedings.

The award of compensation against a self-insurer by a state commission is not a debt or judgment, or liability arising out of contract express or implied. Lane v. Industrial Commissioner, supra. It is an obligation imposed by law and arises out of the status or relationship existing between employer and employee. The philosophy underlying the workmen's compensation laws is that industrial accidents are inevitable incidents of modern industry and that the burden thereof should be borne by industry rather than by the unfortunate victims of the accidents. The loss, distributed by insurance, enters into the cost of production and is eventually paid by the consuming public. Where a large business, such as the Davison

Chemical Company, carries its own risk, it does so presumably because this is thought less expensive than insurance in the state fund or with private insurance companies; but in such a case the cost of industrial accidents is just as truly a part of the cost of doing business as is the cost of insurance where insurance is carried; and, where an award is made payable in installments, such installments constitute a continuing expense of the business, which under the law must be met as they fall due, just as taxes and other public charges must be met.

Compensation awards differ from ordinary debts of the corporation in a number of particulars, but there is this difference in their origin: the ordinary debt arises out of credit extended to the corporation by the claimant; the compensation claim arises out of the status or relationship existing between employer and employee. The ordinary debt represents loans or advancements made to the business. The compensation claim arises out of the business itself. A business is more than the property which it employs. It represents all of the intangible human values which are put into it including the labor and loyalty of its employees. The purpose of the compensation act is that this business, this going concern, shall bear the burden of industrial accidents, instead of the unfortunate injured employee. He has contributed to the building of the business. He has made one of the sacrifices which with statistical regularity it demands. He is to be compensated by a charge which the law imposes upon the business as a fixed expense. Uninjured laborers contribute by their labor to the operation of the business and are paid on the basis of that contribution. The employee who is injured or killed has made his contribution, just as the superannuated employee has made his; and in equity and good conscience the compensation award should be held a charge on the income of the business, just as is the wage of the laborer or the pension of the superannuated employee. Whether upon the winding up of the corporation and the distribution of assets such claims can be given priority in the absence of statute, is a question which we need not consider. The question here is whether they are payable from income earned by the business while it is being preserved and carried on as a going concern by the court. This brings us to the consideration of the principles which should govern courts of equity in dealing with such a situation.

The principle of equity applicable is that he who seeks equity must do equity.

Creditors and lien claimants need not seek the aid of equity in enforcing debts and liens. When they ask a court of equity to grant the extraordinary relief of protecting a private corporation's business from the legal process of its creditors and to operate it under order of court so as to preserve its going concern value for their benefit, they should be willing that the claims of those who have helped to give it value as a going concern and whose claims have been imposed upon it by law as a fixed expense should be paid from the income derived from its continued operation.

The situation is closely analogous to that presented in the line of cases involving claims against railroad receivers for labor and supplies furnished railroads prior to receivership, which have enabled the business to be carried on and have been furnished with the expectation that they would be paid for out of current earnings. The leading case on the subject is Fosdick v. Schall, 99 U. S. 235, 253, 25 L. Ed. 339, the doctrine of which was applied in Hale v. Frost, 99 U. S. 389, 25 L. Ed. 419, as authority for paying from current earnings of the road while in receivership claims for supplies furnished it prior thereto. The controlling principle was thus stated in Fosdick v. Schall:

"The mortgagee has his strict rights which he may enforce in the ordinary way. If he asks no favors, he need grant none. But if he calls upon a court of chancery to put forth its extraordinary powers and grant him purely equitable relief, he may with propriety be required to submit to the operation of a rule which always applies in such cases, and do equity in order to get equity. The appointment of a receiver is not a matter of strict right. Such an application always calls for the exercise of judicial discretion; and the Chancellor should so mould his order that while favoring one, injustice is not done to another. If this cannot be accomplished, the application should ordinarily be denied."

In Miltenberger v. Logansport R. Co., 106 U. S. 286, 308, 1 S. Ct. 140, 27 L. Ed. 117, it was held that a receiver should pay arrears in operating expenses and indebtedness due connecting lines for ticket and freight balances. In Burnham v. Bowen, 111 U. S. 776, 4 S. Ct. 675, 28 L. Ed. 596, it was held that coal furnished a railroad prior to receivership should be paid for by the receiver out of current earnings; and the same holding was made in Virginia & Alabama Coal Co. v. Central Railroad & Banking Co. of Georgia, 170 U. S. 355, 18 S. Ct. 657, 42 L. Ed. 1068. And in Southern Railway Co. v. Carnegie Steel Co., 176 U. S. 257, 20 S. Ct.

347, 358, 44 L. Ed. 458, the doctrine was applied to claims for the value of steel rails furnished prior to the receivership. In the case last cited the court said:

"This court has uniformly refrained from laying down any rule as absolutely controlling in every case involving the right of unsecured creditors of a corporation, whose property is in the hands of a receiver, to have their demands paid out of net earnings in preference to mortgage creditors. But it may be safely affirmed, upon the authority of former decisions, that a railroad mortgagee when accepting his security impliedly agrees that the current debts of a railroad company contracted in the ordinary course of its business shall be paid out of current receipts before he has any claim upon such income; that, within this rule, a debt not contracted upon the personal credit of the company, but to keep the railroad itself in condition to be used with reasonable safety for the transportation of persons and property, and with the expectation of the parties that it was to be met out of the current receipts of the company, may be treated as a current debt; that whether the debt was contracted upon the personal credit of the company, without any reference to its receipts, is to be determined in each case by the amount of the debt, the time and terms of payment, and all other circumstances attending the transaction; and that when current earnings are used for the benefit of mortgage creditors before current expenses are paid, the mortgage security is chargeable in equity with the restoration of any funds thus improperly diverted from their primary use."

In Gregg v. Metropolitan Trust Co., 197 U. S. 183, 25 S. Ct. 415, 49 L. Ed. 717, distinction was drawn between payment from earnings and payment from the capital fund in the hands of the receiver, the court holding that one who had furnished ties to the road prior to the receivership was entitled to payment from the surplus earnings of the receiver, but not from the capital fund in his hands, unless it were shown that such payment was necessary to the business of the road, and not merely that the ties were necessary for its preservation, or unless there had been a diversion of earnings to payments properly chargeable against the capital fund. This case is of importance because of the holding that a finding that the payment is necessary to the continuance of the business is not necessary to justify payment from current earnings.

We do not mean to say that the decisions applying what has come to be known as the "six months' rule" constitute controlling authority on the question before us. We cite them as illustration of how the maxim, "he who seeks equity must do equity," has been applied by the courts to protect the rights of those who have made contribution to the carrying on of a business with expectation that they were to be paid from current earnings, where the courts have been called upon to carry on the business so as to preserve it for the benefit of its creditors. It is true that in the case of railroads the public has an interest in their continued operation, but so also have the creditors; and it is because these have asked the exertion of the extraordinary power of equity to continue the operation of the business, and because the court is operating it for their protection, that the court has laid down the rule that the receivers must pay what would be treated as current expense of operation if the business were left to be operated by its owner. It is worthy of note that this rule was established nearly half a century ago by courts of equity without the aid of statute, and that Congress has recently approved it in the recent amendment to the Bankruptcy Act (section 77 (c), 47 Stat. 1477, 11 USCA § 205 (c). And see "The Present Status of the Six Months Rule" by Thomas O'Gorman Fitzgibbon, XXXIV Columbia Law Review, 230.

On like principles, we think that a court of equity, which at the request of creditors and stockholders has stayed the hands of creditors and taken over the operation of a business, should require the operating receiver to pay as an expense of the business the compensation payments falling due during the receivership. Certainly the cost of continuing compensation insurance would be thus paid; and, as we have seen, compensation payments by a self-insurer are as much a part of the cost of doing business as is the cost of insurance. These compensation payments have been awarded because of the contribution which the employee, who has been injured or killed, has made to the going concern value of the business which the court is asked to conserve and protect. The amounts awarded have been met by the corporation prior to receivership as a continuing expense of the business, and when the court, at the request of, creditors or stockholders, stays the hands of creditors and operates the business itself for the purpose of preserving its value as a going concern, it should require that these awards, which are primarily charges against the business which it is thus carrying on, be met as other current expenses are met by the receivers. This

i·· certainly in accord with the spirit of the statute regulating receiverships in the federal courts, if not required by the express terms of that statute, which provides (Judicial Code, § 65, 28 USCA § 124):

"Management of property by receivers. Whenever in any cause pending in any court of the United States there shall be a receiver or manager in possession of any property, such receiver or manager shall manage and operate such property according to the requirements of the valid laws of the state in which such property shall be situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof. * * *"

There can be no question but that the owner of the business being operated by the receivers in this case would have been bound under the state law to make the compensation payments in question if it had been left in possession of the business.

■ For the court not to require its receiver to make the compensation payments which the state law requires of the owner of the business, would place it in the position of using its power to preserve the business for stockholders and creditors, without regard to the most helpless class of those having claims against the business itself. And it is no answer to this to say that the injured employees and their dependents should be protected in the case of self-insurers by the bonds which may be required. The bonds may not be required or may be inadequate; and, in addition to this, the persons in whose favor awards have been made may starve or become objects of charity while the bonds are being enforced. The purpose of the compensation acts was to grant injured employees certain and speedy compensation; and they should not be defeated of that compensation, or be delayed in obtaining it, while the business which has assumed the payment of the compensation as a continuing expense, is being operated by a court of equity for creditors and stockholders, who are its ultimate owners. The fact that the company which has executed the bond of a self-insurer may be saved from loss under the bond to the extent that payments are made by the receiver, is beside the point. If it receives such benefit, this is but an incident of the continued operation of the business.

■ It is argued that the payments of compensation result in no "economic benefit" to the estate in the hands of the court and are not allowable for that reason. But the same is true of wage claims, which are allowed independently of statute, and of claims for coal, steel rails, and amounts due operating lines for freight and ticket balances. These are allowed, not because they are of "economic benefit" to the estate, but because they represent, not credit extended, but contributions to the carrying on of the business which is being preserved and because of the understanding that payment therefor would be made from current earnings. As we have seen, both of these elements in substance are present in compensation awards.

In Wood v. Camden Iron Works (D. C.) 221 F. 1010, a federal receiver operating a business was directed to continue compensation payments. The compensation act of New Jersey, under which the compensation awards were made in that case, provided that the agreement to accept the compensation act should bind the employer and those conducting his business during bankruptcy or insolvency. The court held that the effect of the act was to place the burden of the compensation payments upon the continuance of the business, and that they should be classed as operating or administrative expenses. We think that the same result follows independently of statute. Certainly such payments are in effect operating expenses where the business is being conducted by its owners; and a federal court should recognize their true relationship to the business when operating it for the benefit of creditors and stockholders.

The effect of a holding that only payments which result in "economic benefit" to the estate in receivership are allowable from the income of operation would not only run counter to the line of decisions to which we have adverted, but it would also result in cruel injustice to a large class of employees who are receiving old age pensions from corporations in receivership, if the principle of such decision should be applied to them. The old age pension is in all respects similar to the compensation award. The superannuated employee, like the injured employee, has already made his contribution to the business; and no "economic benefit" results to the estate in receivership as the result of the payment of his pension except the intangible benefit of good will and strengthening of morale from honest dealing, which results equally from the payment of disability compensation. Nevertheless it is held, and we know of no holding to the contrary, that operating receivers should continue the payment of old age pensions. Circuit Judge Pritchard of this court authorized the payment of such pensions in the first Seaboard

Air Line Railway receivership in 1909, and Judge Groner authorized their payment in the present Seaboard receivership. Such payments have also been authorized in the Norfolk & Southern receivership in this Circuit, and in the receiverships of the St. Louis-San Francisco Railway Company, the Central of Georgia Railway Company, the Florida East Coast Railway Company, and the Brooklyn Rapid Transit Company in other Circuits. The widespread injustice and suffering which would result from a contrary holding may be judged from the fact that the amounts disbursed on account of old age pensions in the present Seaboard receivership were $101,668 in 1931, $105,079 in 1932, and $115,000 in 1933. The idea that the faithful employees drawing these pensions as a result of service which has built up the business of the companies for which they have worked, are to be stripped in their old age of the fruits of their service and fidelity because they are no longer of "economic benefit" to the business which is in receivership, is one which no court of justice should countenance for a moment. And the equity of injured employees or the dependents of deceased employees receiving compensation payments is just as strong. It would be a reproach to any system of justice to leave them unprovided for while preserving for the benefit of creditors and stockholders the business which they have helped to build.

The fact that the statute does not provide for the protection of those receiving compensation payments and that no decision has dealt with their rights in the absence of statute, is no reason why a court of equity in undertaking the operation of the business should not safeguard their rights. One of the glories of equity jurisprudence is that it is not bound by the strict rules of the common law, but can mold its decrees to do justice amid all the vicissitudes and intricacies of life. The principles upon which it proceeds are eternal; but their application in a changing world will necessarily change to meet changed situations. If relief had been granted only where precedent could be found for it, this great system would never have been developed; and, if such a narrow view of equitable powers is adopted now, the result will be the return of the rigid and unyielding system which equity jurisprudence was designed to remedy. As was well said by Prof. Pomeroy (Equity Jurisprudence [4th Ed.] § 60):

"The general language of some writers, and particularly of Blackstone, presents an erroneous theory as to the office of precedents in equity, and if followed, would check and abridge the beneficent operation of its jurisdiction. The true function of precedents is that of illustrating principles; they are examples of the manner and extent to which principles have been applied; they are the landmarks by which the court determines the course and direction in which principles have been carried. But with all this guiding, limiting, and restraining efficacy of prior decisions, the Chancellor always has had, and always must have, a certain power and freedom of action, not possessed by the courts of law, of adapting the doctrines which he administers. He can extend those doctrines to new relations, and shape his remedies to new circumstances, if the relations and circumstances come within the principles of equity, where a court of law in analogous cases would be powerless to give any relief. In fact, there is no limit to the various forms and kinds of specific remedy which he may grant, adapted to novel conditions of right and obligation, which are constantly arising from the movements of society. While it must be admitted that the broad and fruitful principles of equity have been established, and cannot be changed by any judicial action, still it should never be forgotten that these principles, based as they are upon a Divine morality, possess an inherent vitality and a capacity of expansion, so as ever to meet the wants of a progressive civilization."

Surely a court of equity, which has found means in receivership proceedings to protect the claim of the coal company which has furnished coal, the steel company which has furnished rails, and the workman who has furnished labor prior to the receivership, is not powerless to protect the rights of the injured or superannuated employee in the business which he has helped to build. As has been well said, "The arm of equity is not shortened or palsied"; and we may add that the appeal to the conscience of the chancellor is no less strong when it relates to the means of livelihood of an injured or superannuated employee, who has a claim on the business because of the contribution that he has made to it, than when it relates to the claim of one whose contribution consists in materials furnished.

For the reasons stated, the order appealed from will be reversed and the cause will be remanded to the court below with direction to enter an order that the receivers, so long as they continue to operate the business intrusted to them, shall pay as expenses

thereof the monthly compensation awarded petitioner, including the installments which are in arrears.

Reversed.