DUDLEY et al. v. MEALEY et al.

No. 140.

Circuit Court of Appeals, Second Circuit.

Jan. 5, 1945.

Laurence Sovik, of Syracuse, N. Y., for appellants Frank A. Dudley and others.

George I. Sleicher, all of Albany, N. Y., for appellant Paul J. Hinkey.

George J. Hatt, 2nd, of Albany, N. Y., for appellee Carroll E. Mealey, trustee.

B. Jermain Savage, of Albany, N. Y., for appellee First Trust Co. of Albany.

Harold P. Seligson, of New York City, for appellees General Mortgage Bondholders Committee.

C. Emory Lochner and Avrom M. Jacobs, both of Albany, N. Y., for appellee First Mortgage Bondholders Committee and National Commercial Bank & Trust Co.

Before L. HAND, AUGUSTUS N. HAND and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

This case comes before us upon two appeals from an order in bankruptcy, approving a plan of reorganization of the Albany Hotel Corporation, a debtor in a reorganization under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq. The appeals involve different questions: one is by a committee of shareholders, who assert that the debtor was not insolvent, and that they should not have been excluded from the plan of reorganization as they were. The other is by a single bondholder of an issue known as "General Mortgage 6% Bonds," who complains that certain unsecured creditors were preferred, and that the First Trust Company of Albany, trustee of the bondholders of whom he is one, obtained security through an abuse of its fiduciary position. We shall take up the appeals separately, as our disposition is different for each. The facts are as follows. The debtor which was organized in 1897, owns a large plot of ground in the City of Albany, on which there has been a hotel since 1898. This action was precipitated by an action of foreclosure, commenced on March 17, 1943, by the trustee of another issue, known as the "First and Refunding Mortgage 5% Bonds," in which a receiver was appointed. The debtor on March 20th followed with this action under Chapter X, begun by voluntary petition. On December 31, 1943, the property was subject to four liens, which in the order of their priority were as follows: $16,000 of "First Mortgage 5% Bonds" of date May 1, 1909, overdue, on which interest of $934.06 was unpaid; $784,000 of "First and Refunding 5% Bonds," of date January 1, 1916, not due, on which $58,800 of interest was unpaid; $210,000, "General Mortgage 6% Bonds," of date January 1, 1916, overdue, on which $20,760 of interest was unpaid; $110,000 "Gold 7% Bonds," of date March 29, 1922, overdue, on which $13,475 of interest was unpaid. To these must be added current liabilities, real estate taxes and accounts payable, $182,424.76, making a total indebtedness of $1,396,393.82 on December 31, 1943. Against this there was on that day cash of $70,866.39; accounts receivable of $16,971.12, and inventories of $34,198.71, making a total for current assets of $122,036.22; to which must be added $1,804.08 deposits with public service corporations; bank deposits of $75,677.36, and prepaid expenses of $7,562.16: a total of $207,079.82, which, when subtracted from the total indebtedness just mentioned, leaves $1,189,314, which the fixed assets had to supply, if the debtor was to be solvent. The difference between the financial situation on December 31, 1943 and March 20, 1943, when the petition had been filed, was less than $5000 and may be disregarded.

The hotel had been unsuccessful for many years. Without any allowance for depreciation, it had met its fixed charges only twice between 1937 and 1942, and if the depreciation charges carried on its books were deducted, it had not done so since 1930, the last year when it declared a dividend. Its average earnings over its fixed charges from 1931 to 1942, inclusive, had been about $16,000, not allowing for depreciation. Two witnesses—Toth for the trustee, and Udd for the shareholders—experts in such matters, testified at the hearing (the judge had personally selected Toth at an earlier stage in the action, presumably as a disinterested person, to appraise the hotel). Toth estimated that the earnings without allowance for depreciation—from 1937 to 1943, inclusive—had been from $43,000 to $49,000, which he capitalized at four per cent—$1,250,000. That made the debtor solvent. He did not however say that he considered four per cent a proper rate at which to capitalize; he was calculating upon the value of land only, and

since first mortgages on land pay from four to four and a half per cent and the rate is lowest on the land, he took the four per cent, because the value of the hotel was "all in land." He had never heard of any one buying a hotel on the basis of twenty-five times its earning capacity before depreciation, but always at considerably less. Two witnesses for the shareholders appraised the land, one at $1,000,000 (and the building at $700,000); the other the land alone at $900,000. If Toth was right in regarding the value of the land as the only value of the hotel, he was far in advance of these witnesses. A witness for the shareholders valued the furniture, furnishings, china, silver and linen at $208,000. Udd computed a number of hypothetical annual earnings of the hotel, which varied from $218,000 to $155,000. These presupposed economies which had never been practiced, and were only remotely based upon any earnings that the hotel had ever made in the past. To these figures Udd applied a factor of ten per cent for capitalization, and thus arrived at values for the hotel of between $1,500,000 and $2,000,000.

■ The judge found that the value of the assets on March 20, 1943, was less than $1,300,000, which, after deducting quick assets of about $120,000, meant that the hotel and its furniture and gear were worth less than $1,180,000; the limit of our review is to say whether that figure was "clearly erroneous." The Supreme Court has several times said that the best test of the value of a going commercial enterprise is its earning capacity. Galveston H. & S. R. Co. v. Texas, 210 U.S. 217, 226, 28 S.Ct. 638, 52 L.Ed. 1031; Consolidated Rock Products Co. v. Dubois, 312 U.S. 510, 525, 526, 61 S.Ct. 675, 85 L.Ed. 982; Group of Institutional Investors v. Chicago, M. St. P. & P. R. Co., 318 U.S. 523, 540, 63 S.Ct. 727, 87 L.Ed. 959. In the case at bar, that is a particularly apt test; and obviously, the judge was not bound to accept the testimony of Udd, based as it was, not upon what the earnings had been in the past, but on what he assumed they might become in the future. It is of course impossible to divine what economies will be made, and what, under other management, the hotel may earn; but it is already forty-five years old, and since 1928 it has suffered the competition of a more modern, better equipped, rival in a city, where until then it had had a substantial monopoly. Udd's appraisal was the merest guess; even if it has some

support while the war lasts, there is no assurance that its prosperity, if it comes, will continue. For the ten years—1933–42, inclusive—its average earnings without depreciation were about $65,000, which left less than $5000 after the fixed charges were paid, obviously far too little allowance for depreciation. If Udd's capitalization factor of ten per cent was right the value was only $650,000; and upon the necessary value of $1,180,000, $65,000 is almost exactly five and one-half per cent. If, on the other hand, we take the five years, 1938–1942, the average earnings were less than $51,000; making a capitalization at ten per cent only half a million, and allowing less than four and one-half per cent upon a capitalization of $1,180,000. Conceding that appraisals of such property must be tentative at best, it is apparent that a valuation of less than $1,180,000 for the fixed assets of the debtor was not "clearly erroneous." So far as we can see, the debtor was plainly insolvent, and the judge's finding was almost certainly right.

■ Upon Hinkey's appeal the first question is of our jurisdiction. Although notice was sent to him under § 171 of the hearing required by § 170 for any approval of the Plan, he did not appear and the order under § 174 was entered in his default. Were he concluded by it, it might be argued that he should not be allowed to appeal, since he had not availed himself of the opportunity which the law gave him. However, § 180 expressly provides that approval of a plan "shall not affect the right of * * * a creditor, indenture trustee, or stockholder to object to the confirmation of the plan." It seems therefore an idle formality to require a creditor who failed to appear on the first hearing, but who must be given notice of the second, to wait until the plan comes up for confirmation in order to raise any objections, which are apparent on the face of the plan. All creditors have an absolute right to be heard on all matters (§ 206), and it is desirable that they should be heard as soon as convenient. We can see nothing to be gained by postponing Hinkey's right to be heard until the later stage of the action; and much time, labor and expense may perhaps be saved. Moreover, the matter in which the Plan at bar is challenged, are—at least in one respect—such that the judge might, and perhaps should, have taken notice of them, sua sponte. For these reasons we hold that we have jurisdiction over Hinkey's appeal.

■ His first objection is that the Plan gives priority to those unsecured creditors—$10,276.86—who furnished supplies to the hotel for a short time before the receiver was appointed in foreclosure. The trustee answers that these debts were all very recent; that the supplies were necessary to keep the hotel going and that the "six months rule," applicable to railroads and other public service companies, applied. It is undoubtedly true that in a number of instances courts have refused to extend this doctrine to private corporations. International Trust Co. v. Decker Bros., 9 Cir., 152 F. 78, 85, 11 L.R.A.,N.S., 152; Keelyn v. Carolina Mutual Tel. & Tel. Co., C.C., 90 F. 29; Snively v. Loomis Coal Co., C.C., 69 F. 204; Farmers Loan & Trust Co. v. Grape Creek Coal Co., C.C., 50 F. 481, 16 L.R.A. 603. (Spencer v. Taylor Creek Ditch Co., 9 Cir., 194 F. 635, is to be distinguished upon the ground that the time that the supplies were furnished was too long before the insolvency.) It is also true that it was the interest of the public in the continued operation of railroads—afterwards extended to other public-service companies—on which the priority primarily rested. The doctrine may nevertheless have a larger basis. Just as it is recognized that, after insolvency, the expenses of continued operation of a business may be necessary to preserve its value for the secured creditors themselves, and for that reason that the receiver's creditors have priority, so it may be before insolvency. To take the case at bar, upon the continued operation of a hotel its good will depends; let it once shut down, and it will lose much of its value. Unless the tradesmen with whom it must deal can be protected, as its credit slowly wanes before final insolvency, it must begin to trade upon a cash basis, which may be difficult, or even impossible. Some priority to them may be as essential to the preservation of the business during that period as it is later. While the interests of the public were no doubt the paramount consideration in the origin of the rule, the interests of the lienors themselves may make equally imperative some protection to supply creditors. An instance which goes much further than we need go here is Bowen v. Hockley, 4 Cir., 71 F.2d 781, 784, 94 A.L.R. 856. And this is a particularly apt consideration in a reorganization, when the debtor is not to be liquidated, and when the very purpose of the action is to continue the existing business in the interest of the secured creditors—and, as here, of them alone. It cannot be that a court is helpless to avail itself of that very means of fulfilling the purpose of the action, before the debtor has been taken over, which concededly it is free to employ thereafter. We hold therefore that so far as the supply creditors furnished their goods or their services within a short period of the receivership—six months is the limit—and so far as these were necessary to keep the hotel open, they were proper preferred claims. Since the case must go back anyway, the issue will be left open as to how far the claims at bar fulfill these conditions.

Hinkey's second complaint is that the Plan allowed the First Trust Company to set off a part of the debtor's deposit against its debts to that company. The facts as they appear in the record are as follows. As we have already said, that company was trustee of the "General Mortgage 6% Bonds"; it was also the bank of discount where the debtor kept its account; and both the bank and the debtor had, and for some time had had, some officers and directors in common. On March 17, 1943, the debtor had on deposit $71,987.60; on the other hand the bank held the whole issue of "Gold 7% Bonds," together with a note of the debtor for $10,000, secured by a warehouse receipt of whisky. As soon as the receiver in foreclosure was appointed at the suit of the trustee for the "First and Refunding 5% Bonds," the bank assumed to exercise its right of set-off, and applied all the debtor's deposit against the debts just mentioned, leaving it a creditor of about $48,000 under the "Gold 7% Bonds." Mealey, the reorganization trustee, challenged this set-off, but after negotiation a compromise was effected which is embodied in the Plan. The bank retains $15,000 of "First and Refunding 5% Mortgage Bonds"—which it had held as security—; and $50,000 of the deposit; it surrenders a certified cheque of the debtor for $1650; it pays the trustee $2039.72; it surrenders its $10,000 note; it pays the trustee $21,057.60, representing the balance of the money on deposit; it pays $930, which the debtor deposited to pay interest on the "General Mortgage 6% Bonds"; and it surrenders the "Gold 7% Bonds." The question is whether this settlement shall be permitted to stand: i. e. whether it was consistent with the bank's duties, as trustee for the "General Mortgage 6% Bonds," to avail itself of its right to set the debtor's deposit

off against its individual debts. It argues, and all the other parties to the appeal join with it, that there was at worst a debatable question whether the set-off was a violation of the bank's duty as trustee; and that, since an honest and reasonable claim is an adequate basis for an accord, it was proper to make the settlement. It further argues that the Supreme Court in Case v. Los Angeles Lumber Co., 308 U.S. 106, 130, 60 S. Ct. 1, 84 L.Ed. 110, particularly said that controversies as to the validity of liens and the like might be compromised in a plan of reorganization under Chapter X; that everyone agreed to the settlement except Hinkey, who holds only $1000 of "General Mortgage 6% Bonds," and is presumably actuated by some motive that does not appear upon the surface. Finally, it argues that it was unprepared to meet the issue; that it could have established a good defence; and that in any event the compromise avoided long delays and expense which would have been highly prejudicial to all concerned.

■ It will not be possible finally to dispose of the issue, for the record does not even contain the mortgage; moreover, we agree that it would be unfair to conclude the trustee upon a question which was not in issue below. Nevertheless, enough appears to satisfy us that upon this record the Plan cannot stand. The language relied upon in Case v. Los Angeles Lumber Co., supra, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110, is not to be taken as saying that all kinds of controversies as to liens may be settled by a majority vote. On the contrary, we might be disposed to say that a single creditor may always insist upon the disapproval of a plan, which allows his trustee to profit by a breach of his duty of loyalty. We need not so hold, however, for, even though there may be situations where the delay and expense involved can excuse a compromise in which the trustee is allowed to keep part of such a profit, this was not one. It would have been quick and cheap to obtain a ruling from the court upon the propriety of the trustee's set-off; there was no need to wait until the Plan came up for approval; for any prejudice that may now result from the delay the parties have themselves to thank. That upon this record the bank had no such right is plain. As trustee for the bondholders, it presumably had the only power to foreclose the mortgage; a power which, like all its other powers, it held in their interest alone. By accepting the office of trustee, it bound itself to an undivided loyalty, and was not free to assume any relation with the mortgagor which introduced, or could introduce, a discordant motive into its decisions. All this is hornbook law: "The most fundamental duty owed by the trustee to the beneficiaries of the trust is the duty of loyalty. * * * In some relations the fiduciary element is more intense than in others; it is peculiarly intense in the case of a trust. * * * He" (the trustee) "is not permitted to place himself in a position where it would be for his benefit to violate his duty to the beneficiaries." Scott on Trusts § 170. Nowhere has this duty been asserted in more uncompromising terms than in New York. "The value of the rule of equity * * * lies * * * in its stubbornness and inflexibility." Munson v. Syracuse G. & C. R. R. Co., 103 N.Y. 58, 74, 8 N.E. 355, 358; Globe Woolen Co. v. Utica G. & E. Co., 224 N.Y. 483, 489, 490, 121 N.E. 378; Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 62 A.L. R. 1. The right to set off the mortgagor's deposit against any debts which it might owe the trustee created a lien upon the deposit in case of insolvency; the trustee could have exercised it, had it chosen to foreclose its own mortgage, just as in fact it did exercise it when the trustee for the "First and Refunding 5% Bonds" foreclosed. It inevitably introduced a selfish motive into any decision it might make as to the exercise of its own power; a motive utterly at variance with its loyalty to its beneficiaries. For, being in such a position, it was to its interest so to time any foreclosure that the mortgagor's deposit should be as large as it was likely to become; and some part of every cent, added to the deposit while it delayed, or when it did not delay, was taken from the bondholders, who, as general creditors, were entitled to share in the general assets. That was a fundamental dereliction of duty which the law will not tolerate, but will compel a trustee who puts himself in such a position to disgorge.

■ However, as we have said, we will not finally decide the issue on this record. The mortgage may contain exculpatory covenants which the trustee will wish to invoke in its protection. What they are, does not appear; their effect in New York is, moreover, not wholly free from doubt. Hazzard v. Chase National Bank, 159 Misc. 57, 287 N.Y.S. 541; affirmed 257 App.Div. 950, 14 N.Y.S.2d 147; 282 N.Y. 652, 26 N. E.2d 801; Heyman v. Heyman, Sup., 33

N.Y.S.2d 235, 242. See also York v. Guaranty Trust Co., 2 Cir., 143 F.2d 503, 519, 520. For the time being, we decide only that upon the record before us the First Trust Company was guilty of a violation of its fiduciary duty, from which it cannot profit, and that we will approve no Plan which allows it to retain any part of the debtor's deposit, unless it can excuse itself in a way which does not now appear. The order of approval must therefore be reversed; the cause will be remanded; the district court will give the First Trust Company an opportunity to plead and prove any excuse which it may wish. If the court is satisfied that it has such an excuse, it may again approve the Plan; if not, it will disapprove it, and the action will proceed as though it had done so in the first place. In any further proceedings the court will not recognize the shareholders as having any interest in the reorganization, and will refuse to hear them for any purpose; but it will itself conduct the inquiry into the conduct of the First Trust Company, if Hinkey should default. We suggest also that it will be most desirable not to suffer any further delay; but to determine as soon as possible whether the Plan shall be approved.

Order reversed; cause remanded for further proceedings not inconsistent with the foregoing.