**In re WARNER COAL CORPORATION.**

**No. 3940-W.**

United States District Court
N. D. West Virginia.

May 18, 1949.

G. Alan Garden, Wheeling, W. Va., for Wheeling Electric Co.

Carl G. Bachmann, Wheeling, W. Va., for the trustee, Charles P. Mead.

BAKER, District Judge.

This matter is before me on a review from an order of the Referee, Thomas H. Duval, pertaining to a claim of the Wheeling Electric Company.

Warner Coal Corporation, prior to bankruptcy, operated a coal mine in Wheeling, known as the "Richland" or "Costanzo" mine. The Wheeling Electric Company is a public service corporation, furnishing electric power in and about the City of Wheeling, and furnished the power necessary to the operation of this mine. It filed its claim, being Claim No. 60, in the amount of $13,153.14.

The Warner Coal Corporation ceased operations upon June 25, 1943. An involuntary petition in bankruptcy was filed against the company on October 9, 1943. An operating receiver was appointed October 22nd, and qualified and began operations October 23, 1943.

The claim of the Wheeling Electric Company breaks down into three distinct parts. That portion of the claim, which represents power supplied prior to June 25, 1943, is conceded by the electric company to be a common claim. This amounted to $9,626.98. The current furnished between October 9 and October 23, 1943, is conceded by all parties to be a preferred claim, and was so allowed by the Referee. This amounted to $634.86. This left, as the matter in dispute, a balance of $2,891.30, representing the current furnished between June 25, 1943, the date that the mine ceased active operation, and October 9, 1943, the date the petition in bankruptcy was filed. The electric company claimed that this should be allowed as a preferred claim, since the power was used to preserve the mine.

The coal seam in this mine slopes away from the pit mouth, and it is necessary to pump the same at all times or it will fill with water. In addition to pumping the mine, the Warner Coal Corporation kept a maintenance crew at work in the mine, clearing out falls, repairing tracks, etc. In order for this maintenance crew to work, it was necessary to ventilate the mine by blowing air through it. The testimony of the Receiver, taken before the Referee, and the testimony of Whitney Warner, Jr., President of the Warner Coal Corporation, establishes the fact that had the current been turned off at this mine on June 25th, the mine would have so filled with water that it would have required six months of

more pumping before the Receiver could have started operations after the Receiver took charge. This, from a practical standpoint, would probably have meant that the Receiver could never have operated, since without the income from the operation of the mine, the Receiver would not have had funds to pay for six months pumping.

■ I, therefore, find as a fact that the electric current, furnished between June 25 and October 9, 1943, made possible the operation of the mine by the Receiver when he was appointed. Under this situation, I wish sincerely that I could, as a matter of law, allow the electric company a preferred claim for this current. However, the language of the Bankruptcy Act, 11 U.S.C.A. § 1 et seq., and the decisions construing the same, require me to hold that this is a common claim.

Section 64, sub. a of the Act, 11 U.S.C.A. § 104, sub. a, reads in part:

"The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order of payment, shall be (1) the actual and necessary costs and expenses of preserving the estate subsequent to filing the petition".

The courts have been unanimous in holding that this Act must be strictly construed, since its purpose is to protect the assets of bankrupt estates for the general creditors. See In re Hutchins, D.C., 36 F.Supp. 895; In re Public Ledger, D.C., 63 F.Supp. 1008; Goldie v. Cox, 8 Cir., 130 F.2d 690;

Collier on Bankruptcy, Section 64.102, page 2063, Volume 3, reads:

"Costs And Expenses Incurred Prior To Bankruptcy. * * * Section 64-a (1) creates a priority for debts arising from 'the actual and necessary costs and expenses of preserving the estate subsequent to filing the petition'. The very language of clause (1) itself excludes its application so as to grant a priority within Section 64 to claims for expenses or services accruing prior to the petition. * * * Such actions are generally deemed to be taken primarily in the creditors own interest and claims arising therefrom are not entitled to priority, either under Section 64-A (1) or on equi-

table principles, and have only a general claim against the estate, except where an attachment lien so obtained is preserved for the use and benefit of the estate or in the unusual case where the person is deemed to have acted primarily for the interest of the estate as a whole."

And the same Section of Collier, but on page 2061, reads:

"The actual and necessary costs and expenses of preserving the estate subsequent to filing the petition, are entitled to be paid in full out of the estate and are to be given first priority along with the other three types of debts mentioned in Sec. 64 (1). These costs and expenses include those actually incurred by receiver pending the adjudication and appointment of a trustee."

A well-considered case upon this subject is that of In re Garcia Sugar Corporation, D.C., 49 F.Supp. 350. In that case two creditors of a corporation, with the corporation's consent, paid a firm of public accountants to make an audit of the corporation's books. The corporation then went into bankruptcy and a receiver was appointed. The receiver used this audit in setting up his receivership accounts. It was admitted that if the audit had not been made prior to the bankruptcy, the receiver would have had to make one, and would have had to spend at least the amount that the creditors did in the preparation of this audit. Even under these conditions, the creditors' claim for the cost of that audit was allowed only as a general claim, and was denied priority. See also In re Richards, D.C., 43 F.Supp. 733; In re Burbank Corporation, D.C., 48 F. Supp. 172.

The electric company cites a number of cases, principally Burnham v. Bowen, 111 U.S. 776, 4 S.Ct. 675, 28 L.Ed. 596; Virginia & Alabama Coal Company v. Central Railroad & Banking Co., 170 U.S. 355, 18 S.Ct. 657, 42 L.Ed. 1068; Southern Railway Co. v. Carnegie Steel Co., 176 U.S. 257, 20 S.Ct. 347, 44 L.Ed. 458; Bowen v. Hockley, 4 Cir., 71 F.2d 781, 94 A.L.R. 856; and Dudley v. Mealey, 2 Cir., 147 F. 2d 268.

All of these cases, except the last two, deal with railroad re-organizations. The courts have apparently applied a special rule to railroads and allow claims for materials or services, necessary to keep them in operation, for a period of six months prior to the bankruptcy. Most of the cases recognize this as an exception to the law, and base the exception upon the great interest the general public has in the operation of a common carrier.

The case of Bowen v. Hockley, supra, was decided June 11, 1934. At that time the Bankruptcy Act did not contain the language hereinbefore quoted; hence, that decision is not authority at the present time.

The case of Dudley v. Mealey, supra, dealt with the re-organization of a hotel company, and the Circuit Court of Appeals for the Second Circuit, applied the six-months rule for necessities furnished, under the theory that if a hotel ceases operations, it loses a substantial portion of its good will, and that this good will is a material asset, which should be preserved for the creditors. This case, however, involved a corporate re-organization. The plan proposed contained a provision for paying the claims for necessities furnished within six months in full. The only thing the court actually held was that such a provision in a plan for re-organization did not automatically invalidate the plan. I have the greatest respect for the court which rendered this decision, and was struck by the logic of its opinion. I do not think, however, that it applies to the facts in the case now before me.

I, therefore, find as a matter of fact that the current furnished by the Wheeling Electric Company to the Richland Mine or Warner Coal Corporation, between June 25 and October 9, 1943, was necessary to make possible the operation of the mine by the receiver when he took charge October 23, 1943, but I conclude as a matter of law that this claim is not entitled to priority, but must be treated as a common claim.

The order of the Referee complained of is affirmed.