**COOPERMAN, et al v. GUARANTEE ABSTRACT CO., et al.**

Circuit Court, Pinellas County.

May 15, 1953.

Leonard W. Cooperman and Walter G. Ramseur, both of St. Petersburg, in propria personae and for other individual plaintiffs and St. Petersburg Bar Association.

E. Snow Martin of Bryant & Martin, Lakeland, for the Florida Bar.

Henry S. Baynard and Carroll R. Runyon, both of St. Petersburg, for the Guarantee Abstract Co.

William S. Field and Harold A. Kooman, both of St. Petersburg, for the West Coast Title Co.

W. H. Poe of Maguire, Voorhis & Wells, Orlando, for St. Petersburg Board of Realtors and Florida Association of Realtors.

VICTOR O. WEHLE, Circuit Judge.

These suits were filed in December 1951 by certain lawyers, individuals and as officers of the St. Petersburg Bar Association, alleging certain courses of conduct by the defendant abstract companies and seeking a decree determining which acts of the defendants constituted the unauthorized practice of law and/or the holding out of the defendants by themselves as qualified to practice law and for injunctive relief against such acts and/or holding out. The defendants denied doing some of the acts charged and admitted others, claiming that their performance was permissible and did not constitute the practice of law.

The filing of these suits was widely publicized and resulted in various statements by over-enthusiastic spokesmen which so ex-

cited and alarmed many real estate dealers that petitions to intervene were filed by the St. Petersburg Board of Realtors, a nonprofit corporation, the Florida Association of Realtors, a non-profit corporation, and a group of ninety individual realtors from the St. Petersburg area. The petitions to intervene were granted and answers were filed in behalf of these intervenors, all of whom were represented by the same attorney. These answers alleged in substance that real estate men have the legal right to prepare instruments necessary to close real estate deals in which they act as brokers and asked the court to approve such activities and to define and declare the rights of brokers in such fields.

The Florida Bar also sought and was granted permission to intervene as a party plaintiff, aligning itself with the original plaintiffs in their claims. Depositions were taken and all parties then moved for summary judgment.

Arguments of counsel were heard for three days after which counsel submitted memorandum briefs, all of which have been most helpful, except as hereinafter noted.

The weight of authority, as well as of logic, is to the effect that the right to define and regulate the practice of law belongs to the judicial department of government. Petition of Florida State Bar Ass'n. (Fla.), 40 So. 2d 902; In re Integration of Nebraska State Bar Ass'n. (Neb.), 275 N. W. 265; Lowell Bar Ass'n. v. Loeb (Mass.), 52 N. E. 2d 27; Hulse v. Criger (Mo.), 247 S. W. 2d 855; and Fitchette v. Taylor (Minn.), 254 N. W. 910, 94 A.L.R. 356.

The courts are unanimous in holding that the representation of a client in litigation is the practice of law. When matters other than litigation are involved, we find a wide variety of views. Generally speaking the orthodox, conservative view is that nearly any matter involving the expression of an opinion on legal rights constitutes the practice of law. The more liberal view is that the lawyer's exclusive province should include only the performance of those operations which not only are traditionally the lawyers' but which for the protection of organized society and the assurance of its efficient and economic operation should be performed only by lawyers.

This court inclines to the latter philosophy. Tradition alone is not a completely satisfactory justification for any belief or theory of action. When tradition conflicts with experience or common sense it must yield if mankind is to progress.

The law should not be static but should be a living philosophy adjusting itself to the needs and rights of man. When it ceases to do this it dies, either from neglect and disregard, or by the will of

the people expressed by ballots or bullets. Laws are means, not ends. Ultimately law must be the expression of what most of the people want most of the time. As was well stated by Mr. Justice Terrell in Quinn v. Phipps (Fla.), 113 So. 419, at page 425—

"The law of every country is the outcome and result of the economic and social conditions of that country as well as the expression of its intellectual capacity for dealing with these conditions; the causes which modify the law are usually to be sought in changes which have passed upon economic and social phenomena. When new relations between men arise, or when the old relations begin to pass into new forms, law is called in to adjust them." The Spirit of the Common Law, Pound. Legal doctrines are predicated on reason and custom, mark their growth from rude beginnings, and, like the order of the universe, are constantly changing to adjust the new relations of society.

We proceed then to consider the contentions of the parties herein as advanced by the pleadings and depositions, bearing in mind that the searchlight of common sense is frequently more successful in disclosing the inherent justice of a situation than the microscope of formal logic. When the human eye looks at a newspaper reproduction of a photograph, it recognizes it as a picture. The magnifying glass may show it is merely a series of inked dots, but common sense says that nevertheless it is still a picture.

The issues involving the rights of the realtor intervenors are clear cut and will be first adjudicated.

For many years in this state, lawyers have been critical of real estate brokers, feeling that they have been doing things which are solely the right of the lawyers. Finally a test case was brought in Dade County and Circuit Judge George E. Holt, in Dade County Bar Ass'n. v. Keyes Co., 1 Fla. Supp. 128, entered a strongly-worded decree sustaining the contentions of the lawyers. The case was appealed and the Supreme Court in Keyes Co. v. Dade County Bar Ass'n., 46 So. 2d 605, declared its views and directed the circuit judge to revise the decree "specifically to enjoin whatever the appellant [Keyes Co.] may be doing in the instant case beyond the scope of the realtor." For some reason, possibly because it was difficult to glean from the Supreme Court's opinion exactly what is "the scope of the realtor," no revised decree has ever been entered in the intervening three years. Consequently both lawyers and realtors are still in disagreement in Florida, each claiming to be justified in their contentions under the general language of the Keyes decision.

It is fortunate that the organized realtors and the Florida Bar, representing every lawyer in the state, have intervened in this cause, for now, for the first time in this state, and possibly in any state, a court has been afforded the opportunity to exercise jurisdic-

tion over the entire organized professions of both lawyers and realtors and has been asked by both to define and declare their respective rights in the field in controversy.

This court will therefore attempt to expound these rights in such detail as it is to be hoped will enable both professions to fully understand their rights and will enable the Supreme Court in any appeal taken herefrom to settle once and for all the major issues involved.

For every conclusion stated hereafter it will probably be possible to cite some learned decision of some learned court to the contrary, as well as of some equally learned court in affirmation. To avoid confusion of the laymen, as this decision will undoubtedly be widely read, we shall cite only authorities supporting its contentions, leaving to the industry of counsel on appeal to present the opposing authorities.

The real estate profession or business is a most important one in this state. As of April 1, 1953, in Florida there were actively engaged in the real estate business, as either licensed brokers or licensed salesmen, 13,167 persons. Throughout the state and especially in South Florida, there is a very active real estate market with literally hundreds of thousands of transactions completed annually. In most of these, real estate brokers play a controlling role in causing the transactions to be consummated. The Supreme Court in the Keyes case has definitely recognized the broker's right to draw the original sales memorandum or contract of sale. This is generally the most important document in the entire transaction and requires the greatest knowledge of law. It is from these contracts that most of the litigation involving real estate deals arises and not from faultily prepared deeds, etc., and here, if anywhere, the advice and assistance of a lawyer would be most valuable and would result in many instances in better protection of the parties' rights, yet our Supreme Court and those of many other states have held, as a matter of practical adjustment to the realities of making a deal, that the real estate broker may prepare such a contract without the intervention of a lawyer. That right having been established, this court must now decide what further instruments necessary for the closing of the deal may be lawfully prepared by the broker. It is this court's opinion that, if public convenience, custom and common sense justify the broker in preparing the sales contract, they also justify him in preparing (as part of his services and without making a charge for such preparation except as included in his regular commission for effecting the deal) the standard forms of deeds, purchase money mortgages, mortgage notes, loan mortgages, and leases; provided, however, that standard recognized blank forms for such instruments are used and that the broker in completing such forms inserts in them only such clerical

details as the dates, amounts, names of parties, latest tax year liability, and description of the property involved.

Where the circumstances require the stating of further or more complicated details, conditions, or terms, an attorney should prepare or supervise the preparation of such instruments.

The broker or non-lawyer cannot prepare any of the above instruments except in deals in which he is the broker or a party in interest, see Land Title Abstract & Trust Co. v. Dworken (Ohio), 193 N. E. 650.

This court fully realizes that the above determination of real estate brokers' rights will probably meet with widespread disapproval and condemnation by many lawyers. It is, however, a realistic solution of a vexatious problem. The Supreme Court of Minnesota in Cowern v. Nelson, 290 N. W. 795, in expressing similar views said at page 797—

> It is the duty of this court so to regulate the practice of law and to restrain such practice by laymen in a common sense way in order to protect primarily the interest of the public and not to hamper and burden such interest with impractical technical restraints no matter how well supported such restraint may be from the standpoint of pure logic. Viewing the problem before us in that light, we do not think it would be in the interest of the public welfare to restrain brokers from drafting the ordinary instruments necessary to effectuate the closing of the ordinary real estate transaction in which they are acting. We do not think the possible harm which might come to the public from the rare instances of defective conveyances in such transactions is sufficient to outweigh the great public inconvenience which would follow if it were necessary to call in a lawyer to draft these simple instruments.

This opinion has been arrived at rather reluctantly in view of the offensive nature of the brief filed by the attorney for the realtors. Charity inclines us to feel that the attorney's acknowledged realization of his inadequate oral presentation of his views must have warped his sense of propriety in preparing his brief. Any benefit or satisfaction his clients may receive from the decree to be entered herein will be in spite of his representation, not because of it.

The effect of this decision will not be as financially harmful to the lawyers as they fear it will be. Under section 475.25, Florida Statutes 1951, it is the duty of a real estate broker to advise a prospective purchaser to consult his attorney on the merchantability of the title or to obtain title insurance. Attorneys, when providing such opinions, should prepare the necessary instruments involved in the deal. They have both the opportunity and the duty to do so. Most brokers would be delighted to be relieved of this responsibility. If the attorneys fail to provide this service they generally will have only themselves to blame.

The problems presented by the activities of the defendant abstract companies are more complicated legally but are equally subject to a common sense solution.

The plaintiffs argue that, although a title company, when it is itself directly issuing a title policy, *might* have the right to prepare the instruments producing or perfecting the title which it is to insure, it cannot do so through its authorized agent, if that agent be an incorporated abstract company, unless that agent employs an outside attorney to handle the matter.

Theoretically this contention may be correct (Hexter Title & Abstract Co. v. Grievance Committee (Tex.), 179 S. W. 2d 946, 157 A.L.R. 268) but practically it is absurd and this court does not intend to uphold or perpetuate an absurdity. We therefore hold that the defendant abstract companies, in connection with deals in which they are acting as agents for the issuance of title insurance policies to be issued by their principal, may prepare such instruments and documents as they deem necessary to make the title insurable.

They may also do this when acting as disbursing agent for a lending agency, if title insurance is being issued through them in the same deal.

The escrow business conducted by the abstract companies falls in a different category. If no title insurance is to be issued through them, the abstract companies or other laymen or lay organizations can only act in simple escrows, i.e.—when completely executed instruments are escrowed with them to be delivered on the payment of specified sums or upon the instruction of the parties or their lawyers. Neither the abstract companies nor any other non-lawyers, except the parties, can in such cases prepare any of the instruments involved or pass upon their legal sufficiency or give or render any opinion as to the rights of the parties involved in or arising from the transaction.

All of the above rulings regarding abstract companies are based on the assumption that acting as an agent for a title insurance company or a disbursing agent for a lending agency or as an escrow agent is within the scope of the authority granted by the corporate charters of the abstract companies. If the particular companies here involved do not have such corporate powers (on which point this court is not now passing) they would have no authority or right to do any of the things above authorized.

The Supreme Court of Missouri in Hulse v. Criger, 247 S.W. 2d 855, has arrived at substantially the same conclusions stated by this court in the preceding pages, and we quote with approval its language commencing at page 860—

It is true that a real estate broker has earned his commission when he has found a purchaser ready, willing and able to take the property at the price and upon the terms fixed by the owner. However, we know as a practical matter that he does not get his money at that time; and often there are several written offers and counter offers which result in a contract before it can be said that a purchaser has been found. It is a matter of great importance to the broker to get an agreement in writing and then to close the transaction as promptly as possible, because as a matter of practice that is usually when he gets paid. Thus he is personally concerned in the transaction and actually he is acting partly in his own interest in getting a contract signed and the deal closed. This is recognized by the form of contract, used by the St. Louis Real Estate Board, as shown by our court records, which is signed by the broker, as well as by the buyer and seller, and which provides for the seller in signing to approve not only the buyer's offer but also the commission to be paid the broker. Thus the broker's function is commercial in character and not merely advisory. As a matter of fact, what he seeks to do is to negotiate a completed deal and he often bargains to some extent with both parties to get them together. While as an agent he is required to reveal to his principal everything within his knowledge relating to the transaction and must not put himself in a position antagonistic to his interests, nevertheless, because of his personal interest in negotiating an agreement, he is not in the same completely disinterested position to give him advice about his rights and obligations as a lawyer should be. This, as well as lack of legal training, is an important reason why real estate brokers cannot be permitted to give legal advice to their customers.

However, this is also a practical reason why the completion of the contract is a part of the business of the real estate broker in the transaction; and it is usually to the interest of the seller he represents, as well as his own, to get a binding agreement completed promptly while the parties are together on its terms. Such agreements may be complicated and one or both of the parties may or should realize the need for a lawyer to prepare the contract rather than to use a standardized form; but more often they are simple enough so that such a form will suffice and the parties will wish to avoid further delay or expense by using them. So much real estate business is done in this way, without harmful results, that we do not think the public interest requires it to be changed. In this connection, we note a 1942 agreement approved in principle by the Board of Governors of the American Bar Association and the Board of Directors of the National Association of Real Estate Boards (67 A.B.A. reports 224) which provides in part as follows: "* * * when acting as broker, a realtor may use an earnest money contract form for the protection of either party against unreasonable withdrawals from the transaction, provided that such earnest money contract form, as well as any other standard legal forms used by the broker in transacting such business shall first have been approved and promulgated for such use by the bar association and the real estate board in the locality where the forms are to be used." In view of the authorities herein above reviewed, and our conclusions above stated, we hold that completing such contracts on standardized forms under such circumstances is not unlawful practice of law.

Likewise, general warranty deed and trust deed forms are so standardized that to complete them for usual transactions requires only ordinary intelligence rather than legal training. They are in fact less complicated than contracts for sale of real estate. We know that these forms are furnished to the public at the offices of Recorders of Deeds through the state. We think the preparation of these instruments in closing transactions in which a real estate broker is acting as broker is so closely related to the transaction and the business of the broker as to be practically a part of it and that he is not engaging in unlawful practice of law to prepare them under such circumstances. The same thing is true of ordinary short term leases, notes, chattel mortgages and trust deeds in transactions which the broker procures. However, he cannot properly make separate charges, in addition to his commission, for preparing any instruments or engage in the field of conveyancing and drafting contracts or other legal instruments for the public generally, with or without separate charge. Such conduct would not be any part of his business as a real estate broker but would be placing the emphasis upon conveyancing as a practice of law instead of on his services as a broker; and it would also violate the provisions of RSMo 1949, 484, V.A.M.S.

We are mindful of the statement of Pound, J. in the Title Guaranty & Trust case, supra, 125 N. E., loc. cit. 670, cited by informants, and also approved in People v. Lawyers Title Corp., 282 N.Y. 513, 27 N.E. 2nd 30, as follows: "I am unable to rest any satisfactory test on the distinction between simple and complex instruments. The most complex are simple to the skilled, and the simplest often trouble the inexperienced." Realizing the truth of that statement, we are, nevertheless, inclined to take the view of the Supreme Court of Massachusetts in the Lowell Bar Association case, supra, 52 N.E. 2nd, loc.cit. 34, "We are aware that there has been said to be no difference in principle between the drafting of simple instruments and the drafting of complex ones. (Citations.) But though the difference is one of degree, it may nevertheless be real. (Citations.) There are instruments that no one but a well trained lawyer should ever undertake to draw. But there are others, common in the commercial world, and fraught with substantial legal consequences, that lawyers seldom are employed to draw, and that in the course of recognized occupations other than the practice of law are often drawn by laymen for other laymen, as has already been shown. The actual practices of the community have an important bearing on the scope of the practice of law." As to this matter of degree, it has also been well said: "things do not have to be in broad contrast to have different practical and legal consequences. Actions take estimation from degrees, and of this life and law are replete with examples." Industrial Accident Commission v. Davis, 259 U.S. 182, 42 S. Ct. 489, 491, 66 L. Ed. 888. (See also discussion of simple forms in Liberty Mutual Ins. Co. v. Jones, 130 S. W. 2nd, loc. cit. 958). We think the guiding principle must be whether under the circumstances the preparation of the papers involved is the business being carried on or whether this really is ancillary to and an essential part of another business. The simplicity or complexity of the forms, the nature and customs of the main business involved, the convenience to the public, and whether or not separate charges are made, all have a bearing upon the determination of this question.

We reach the following conclusions:

First: A real estate broker, in transactions in which he is acting as a broker, may use a standardized contract in a form prepared or approved by counsel and may complete it by filling in the blank spaces to show the parties and the transaction which he has procured.

Second: A real estate broker, in transactions in which he is acting as a broker, may use standardized forms of warranty deeds, quit claim deeds, trust deeds, notes, chattel mortgages and short term leases, prepared or approved by counsel and may complete them by filling in the blank spaces to show the parties, descriptions and terms necessary to close the transaction he has procured.

Third: A real estate broker may not make a separate charge for completing any standardized forms, and he may not prepare such forms for persons in transactions, in which he is not acting as a broker, unless he is himself one of the parties to the contract or instrument.

Fourth: The required approval by counsel of standardized forms to be used in real estate transactions properly may be made either by lawyers selected by real estate brokers individually or selected by real estate boards of which they are members.

Fifth: Even in transactions in which he is acting as a broker, a real estate broker may not give advice or opinions as to the legal rights of the parties, as to the legal effect of instruments to accomplish specific purposes or as to the validity of title to real estate; and he may not prepare reservations or provisions to create estates for life or in remainder or any limited or conditional estates or any other form of conveyance than a direct present conveyance between the parties, as provided for in standardized approved forms, to be effective upon delivery.

Sixth: A real estate broker in conferring with parties to obtain facts and information about their personal and property status, other than is necessary to fill in the blank spaces in standardized forms necessary to complete and close transactions in which he is acting as a broker, for the purpose of advising them of their rights and the action to be taken concerning them, is engaging in the practice of law.

A decree may be prepared in accordance with this opinion.